IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
January 7, 2016 Session

IN RE K.F.R.T. ET AL.

Appeal from the Juvenile Court for Hamblen County
Nos. 16035J, 16036J, 16037J     Janice Hope Snider, Judge

No. E2015-01459-COA-R3-PT-FILED-MARCH 10, 2016

This is a termination of parental rights case. The case proceeded to trial on the amended petition of the Department of Children's Services seeking to terminate on multiple grounds the parental rights of L.M. to his children, K.F.R.T., L.E.M.R., and B.A.M.R. (collectively the children). The trial court dismissed the petition after a bench trial, finding and holding that DCS "ha[d] failed to prove by clear and convincing evidence any ground sufficient to justify termination of [father's] parental rights." Whittney N.L. Good, guardian ad litem for the children, appeals. We reverse because we hold that the evidence clearly and convincingly shows that father is guilty of a pattern of criminal conduct "exhibit[ing] a wanton disregard of the child[ren]." Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2014). We find clear and convincing evidence that it is in the best interest of the children to terminate father's parental rights.

**Tenn R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which JOHN W. MCCLARTY, J., joined. D. MICHAEL SWINEY, C.J., filed a separate opinion concurring in part and dissenting in part.

Thomas C. Jessee, Johnson City, Tennessee, and Crystal M. Goan, Greeneville, Tennessee, for the appellant, Whittney N.L. Good, Guardian ad Litem.

Herbert H. Slatery, III, Attorney General and Reporter, and, Mary Byrd Ferrara, Assistant Attorney General, Nashville, Tennessee, for the appellee, the Tennessee Department of Children's Services.

W. Joe Bell, Knoxville, Tennessee, for the appellee, L.M.

## OPINION

### I.

The children, along with a fourth sibling, Analilia R.,[1] were removed from father for the reason explained by us in ***In re Analilia R.***:[2]

> [Analilia] entered a battered women's shelter with her mother and three siblings following a domestic assault committed by [f]ather against the mother. Father was arrested and later pled guilty to the assault.

No. E2015-00479-COA-R3-PT, 2015 WL 7567090, at *1 (Tenn. Ct. App. E.S., filed Nov. 24, 2015). Father is a Mexican national who now lives in Mexico.

The children and their sibling were adjudicated dependent and neglected in April 2010. DCS filed a petition to terminate father's parental rights to the four children in March 2012. Later, DCS filed an amended petition. It was this pleading on which this case proceeded to trial in January 2015.

DCS sought to terminate father's rights to the children on four grounds: noncompliance with a permanency plan, failure to support, persistence of conditions, and wanton disregard. As previously noted, the trial court refused to terminate father's parental rights because it held that there was insufficient evidence to establish any of the four grounds.

### II.

The notice of appeal in this case was filed by the GAL. She challenges all of the trial court's ultimate findings with respect to the four grounds alleged in the amended petition filed by DCS. She also states that, in the event we find and hold a ground for termination was clearly and convincingly established by the evidence, we should go further and hold that termination is in the best interest of the children. DCS, while a

---

[1] Father's rights with respect to Analilia R. were terminated by the trial court and affirmed by us in an opinion released November 24, 2015. *See **In re Analilia R.***, No. E2015-00479-COA-R3-PT, 2015 WL 7567090 (Tenn. Ct. App. E.S., filed Nov. 24, 2015), *perm app. denied* (Tenn. Feb. 22, 2016).

[2] While Analilia's case and this case took separate tracks on appeal, both arose out of the *same* trial evidence.

technical appellee in this case, urges us to terminate father's parental rights.

## III.

On our review, this Court has a duty to examine whether the evidence preponderates against the trial court's findings of fact. *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id.*; Tenn. R. App. P. 13(d). "We review all issues of law de novo upon the record with no presumption of correctness." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993)).

"Both the United States and Tennessee Constitutions protect a parent's right to the custody and upbringing of his or her child." *In re Swanson*, 2 S.W.3d 180, 187 (Tenn. 1999) (citing *Stanley v. Illinois*, 405 U.S. 645, 650 (1972); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn.1994)). This right is not absolute and may be terminated if – and only if – "a court finds that one or more of the statutorily defined grounds for termination has been established by clear and convincing evidence." *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)(1)). " 'Clear and convincing evidence' is 'evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.' " *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)).

Proof of just one ground for termination by clear and convincing evidence can support the termination of a parent's rights. *In re Valentine*, 79 S.W.3d at 546 (citing *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000)). To terminate parental rights, a court also must determine that clear and convincing evidence demonstrates that termination is in the best interest of a child. *In re Valentine*, 79 S.W.3d at 546 (citing Tenn. Code Ann. § 36-1-113(c)). "The federal and state constitutions require the opportunity for an individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d at 188 (citing *Stanley*, 405 U.S. at 658-59; *Bond v. McKenzie (In re Adoption of Female Child)*, 896 S.W.2d 546, 548 (Tenn. 1995)).

## IV.

We first address whether the trial court committed error in holding that the termination of father's parental rights to the children was not supported by clear and

convincing evidence of failure to support. Father does not dispute that he failed to pay child support. However, willfulness, ability, and intent are decisive here. It is not enough that a parent fails to pay child support. DCS and the GAL failed to prove that father had the means and ability to pay during the relevant four-month period preceding his incarceration. The trial court made detailed findings as to this issue, and the record does not preponderate against these findings. We agree with the trial court's decision in this regard.

We now address whether the trial court erred in holding that the termination of father's parental rights to the children was not supported by clear and convincing evidence of substantial noncompliance with a permanency plan. We extensively discussed this issue in *In re Analilia R.* when we affirmed the trial court's failure to find this ground with respect to Analilia. The trial court made detailed findings as to father's efforts to comply with the requirements of his permanency plan, which were hampered both by geography and a language barrier. The evidence in the record on appeal does not preponderate against these findings. We affirm the trial court on the issue of substantial noncompliance with the permanency plan.

Next, we examine whether the trial court erred in holding that the termination of father's parental rights to the children was not supported by clear and convincing evidence of persistence of conditions. In *In re Analilia R.*, this Court affirmed the trial court's termination of father's parental rights to Analilia on the ground of persistence of conditions. In the instant appeal, the GAL argues that the exact same evidence supports the exact same conclusion regarding persistence of conditions relative to the children. We disagree. In *In re Analilia R.*, we noted father's criminal history and pattern of instability as part of our analysis of persistence of conditions. However, we also discussed the different special and significant circumstances of that case as they pertained to Analilia's severe health problems. This latter fact distinguishes the present appeal from *In re Analilia R.* We hold that this distinction compels a different outcome as to this issue in this appeal.

V.

We now turn our attention to the issue of wanton disregard. On the allegation of this ground, we hold that there is an abundance of evidence that clearly and convincingly shows that father, by his pattern of criminal activity, exhibited a wanton disregard of his children.

The shorthand label of "wanton disregard" is frequently used to describe a ground in the statutory scheme of abandonment as follows:

4

A parent . . . is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent . . . has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and . . . the parent . . . has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv). In the case now before us, it is undisputed that the children's father was incarcerated in the United States from March 2014 to well into the fall of that year. The record reflects that the amended petition was filed by DCS on June 11, 2014. Hence, subsection (1)(A)(iv) of the statute is implicated by the incarceration dates in this case.

The seminal case in Tennessee with respect to the ground of wanton disregard is *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), an opinion authored by now-retired Justice William C. Koch, Jr. when he was a member of the Court of Appeals. In *Audrey*, the Court affirmed the trial court's decision to terminate a parent's rights on two of the three grounds found by the trial court. One of the two was the ground of wanton disregard. In the course of its opinion, the Court said the following:

Tenn. Code Ann. § 36-1-102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. However, a parental incarceration is not an infallible predictor of parental unfitness. Accordingly, Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s second test for abandonment does not make incarceration alone a ground for the termination of parental rights. An incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of

5

conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

\* \* \*

We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse . . . can alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child. . . . In this case, all of these elements are present. Thus, the juvenile court did not err in finding that Jamie F.'s pre-incarceration conduct displayed a wanton disregard for the welfare of Audrey S. and Victoria L.

*Id.* at 866-68 (internal citations omitted). In *Audrey*, the Court of Appeals opined that wanton disregard can be based upon bad conduct that occurs at any time prior to incarceration:

If parental conduct which exhibits a wanton disregard for the welfare of a child can constitutionally form a ground for the termination of parental rights, it would appear to be of no moment whether that conduct occurred during the four months immediately preceding the parent's incarceration or at *some earlier point in time*.

*Id.* at 871 (emphasis added). The trial court in the case now before us, in discussing wanton disregard, appears to have believed that bad conduct, in order to be actionable on the issue of wanton disregard, must be directly connected in some way with the removal of the children. Here is what the trial court said that leads us to this conclusion:

Father's three (3) D.U.I. convictions indicate that he had a substance abuse problem involving the use of alcohol, but father's criminal convictions from November 25, 2008, were not grounds for the removal of his children in July, 2009.

Contrary to the trial court's statement, *Audrey* teaches that father's D.U.I.s can certainly be considered in this case on the issue of wanton disregard.

The statute now under discussion pertains to "conduct . . . that exhibits a wanton disregard for the welfare of the child[ren]." Tenn. Code Ann. § 36-1-102(1)(A)(iv). This part of the statute focuses as much on a parent's state of mind vis-à-vis his children, as it

6

does on the conduct itself. In other words, what does the bad conduct tell us about a parent's concern for the welfare of his children or lack thereof? If you really love and care for your children, would you repeatedly get drunk and drive or batter your wife in your children's presence?

The evidence in this case clearly shows a man who has no qualms about engaging in criminal conduct. On March 16, 2008, father was arrested for two counts of theft of property. On that same day, he was also arrested for D.U.I., driving without a valid driver's license, and violation of the financial responsibility law. A little over a month later, on April 28, 2008, he was arrested for speeding, driving without a valid license, and violation of the financial responsibility law. Exactly one month after that, on May 28, 2008, he was again arrested for D.U.I., driving without a valid license, failure to wear a seatbelt, and violation of the financial responsibility law. On October 4, 2008, he was arrested for D.U.I. and driving without a valid license for the third time in less than a year. He pled guilty to all of the above offenses on November 25, 2008. On June 29, 2009, he was arrested for domestic violence after striking the biological mother of his children in front of them.[3] He pled guilty to the domestic violence charge on August 3, 2009, and was subsequently deported in October 2009. Following his deportation and while his children were in DCS custody, father was arrested, incarcerated, and deported on at least four separate occasions for illegally entering the country. Finally, in 2013, he was arrested and incarcerated in Mexico for four months on a charge of extortion.[4]

Over the course of time, the father in this case was arrested for theft, multiple D.U.I. offenses, repeated traffic offenses, domestic violence against the biological mother of the children central to this appeal, multiple illegal border crossings, and even extortion. These arrests resulted in multiple incarcerations and/or deportations. When viewed in their totality, these offenses clearly indicate that the "parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders [father] unfit or poses a risk of substantial harm to the welfare of the child[ren]." *In re Audrey S.*, 182 S.W.3d at 866.

Is this the conduct of a man who is concerned with his children's welfare? The

---

[3] "Exposing a child to domestic violence is conduct exhibiting wanton disregard." *In re Lilly C. et al.*, No. E2015-01185-COA-R3-PT, 2016 WL 736386, at *4 (Tenn. Ct. App. E.S., filed Feb. 25, 2016) (citing *In re Robert D.*, No. E2013-00740-COA-R3-PT, 2014 WL 201621, at *8 (Tenn. Ct. App. E.S., filed Jan 17, 2014)).

[4] DCS referred to this offense in its post-trial memorandum as a charge for conspiracy. The father, however, testified on January 21, 2015, that he had been incarcerated in Mexico for extortion.

question is rhetorical in nature. He says he illegally crossed the border on multiple occasions in an attempt to see his children. Where is the proof of this other than his own self-serving statement? During the five years his children have been in DCS custody, where is the proof that, outside of a couple of phone conversations, he made any real attempt to maintain a meaningful relationship with his children?

*Audrey* makes an important point that cannot be overlooked:

> Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child.

*Id.* Father's criminal conduct in fact led to a number of incarcerations and deportations. He must have known – or is certainly charged with knowledge – that his conduct could land him in jail or ensure a one-way ticket back to Mexico. He apparently did not care how all of this could and would affect the welfare of his children.

At the time the children came into the custody of DCS, they ranged in age from ten months to five years. They are now twelve, ten, and seven and a half. At this point in time, they have been with the same pre-adoptive family for over five years.[5] They now no longer speak Spanish.

A memorandum prepared by DCS and filed with the trial court in February 2015 says it best:

> Due to respondent father's lack of concern with and concern for the children, no meaningful relationship remains between him and the children. When the children entered the Department's custody, their ages ranged from ten months to five years old. Now, the children's ages range from six years to nearly eleven years old and all but the child, [K.F.R.T.], who has referred to respondent father as a "monster," have spent more time out of the respondent father's care than in it. The respondent father himself admitted that the only bond remaining between him and the children is the genetic bond

---

[5] When questioned about how long the children had resided with her, the pre-adoptive mother of the children testified on January 22, 2015, that "I had them a good four years, then they were gone to a pre-adoptive home for one year, and now we have them back and we are planning on adopting them, if possible."

between them.

As a postscript to this opinion, we would point out that there is nothing in this opinion at odds with our earlier decision in *In re Analilia R*. Because the issue of wanton disregard was not raised as an issue on appeal in the earlier appeal, this is the first time the facts underlying that issue are undergoing appellate review.

The evidence on the issue of best interest is clear, convincing, and overwhelming. It is in the best interest of the children to terminate father's parental rights and allow these children to be adopted by a family who will love and care for them.

VI.

While we agree with a portion of the trial court's judgment, we reverse the ultimate decision of the trial court dismissing the amended petition of DCS. It results that the parental rights of L.M. to his children K.F.R.T., L.E.M.R., and B.A.M.R. are hereby terminated. Costs on appeal are taxed to the appellee, L.M. This case is remanded to the trial court for enforcement of our judgment terminating L.M.'s parental rights and for collection of costs at the trial court level, which costs are also assessed against L.M.

_____
CHARLES D. SUSANO, JR., JUDGE