# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs July 1, 2016

# IN RE RENALDO M. JR.[1], ET AL.

### Appeal from the Juvenile Court for Montgomery County
### No. MCJVDNCV104, MCJVDNCV105, MCJVDNCV106    Tim Barnes, Judge
_____

### No. M2016-00472-COA-R3-PT – December 30, 2016
_____

The trial court terminated the parental rights of a Mother to her three children on the grounds of abandonment by engaging in conduct evidencing a wanton disregard for the children's welfare and persistence of conditions. Mother appeals, contending that the evidence is insufficient to sustain the termination of her rights. Concluding that the evidence of Mother's pre-incarceration conduct does not clearly and convincingly prove a wanton disregard for the children's welfare, we reverse the trial court's finding in that regard. There is clear and convincing evidence supporting holding that the conditions which led to the children's removal from Mother's custody persisted and that termination of her rights is in the best interest of the children; accordingly, we affirm the termination of Mother's rights on that ground.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Reversed in Part and Affirmed in Part; Case Remanded

RICHARD H. DINKINS, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and ARNOLD B. GOLDIN, J., joined.

Gregory D. Smith, Clarksville, Tennessee, for the appellant, Teresa K.

_____

[1] This Court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties. The style of this case in the trial court was *State of Tennessee Department of Children's Services vs. Teresa K.* ("Mother") *and Renaldo M.* ("Father"); the children were identified under the line "In the matter of," with a separate case number for each child. The Notice of Appeal was filed by Mother. It is not clear from the record how the caption of the case became *In Re Renaldo K., et al.* While the body of the Notice of Appeal used the name Renaldo [Mother's last name], Renaldo's birth certificate uses the name Renaldo [Father's last name]. Accordingly, we have changed the case caption of this opinion to be consistent with Renaldo's birth certificates, and the name "Renaldo M., Jr." will be used in this opinion.

Herbert H. Slatery, III, Attorney General and Reporter; and Alexander S. Rieger, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services

**OPINION**

## I.    FACTUAL/PROCEDURAL HISTORY

Three children, Renaldo M., Jr. (born February 2008), Brandon M. (born January 2009), and Bridgette K. (born March 2012), were born to Teresa K. ("Mother") and Renaldo M. ("Father"). In May 2012, a dependency and neglect proceeding based on allegations of environmental neglect was initiated in Montgomery County Juvenile Court by the Department of Children's Services ("DCS"), and on May 21 the children were placed into DCS custody.[2] At the adjudicatory hearing held on September 4, 2012, the children were found to be dependent and neglected due to environmental neglect and remained in DCS custody. On May 8, 2013, DCS filed a petition to terminate Mother's parental rights on the following grounds: (1) abandonment by failure to visit, (2) abandonment by failure to support, (3) abandonment by failure to provide a suitable home, (4) substantial non-compliance with the permanency plan, (5) persistence of conditions, and (6) mental incompetence.[3] DCS voluntarily dismissed the termination petition on February 19, 2014.

On January 2, 2015, Mother was arrested on a theft of property charge and remained in jail until February 5, 2015. DCS filed a new petition to terminate Mother's and Father's parental rights on January 26, 2015, alleging as the grounds for termination abandonment by incarceration - wanton disregard and persistence of conditions.[4]

The case was heard on July 27 and August 27, 2015. In an order entered on February 9, 2016, the trial court sustained the grounds of abandonment and persistence of conditions and, after finding that termination was in the children's best interest, terminated Mother's and Father's rights. Mother appeals, contending that "[t]he evidence of record is insufficient, as a matter of law, to sustain the Trial Court's finding that the State met the Tenn. Code Ann. § 36-1-113 criteria for terminating [Mother's] parental rights to [the children] by clear and convincing evidence."[5]

---

[2] Two of the children, R.M., Jr. and B.M., had previously been placed into DCS custody in August of 2010 due to environmental neglect and lack of supervision; they were returned to Mother's and Father's custody on December 15, 2011.

[3] DCS alleged additional grounds pertaining exclusively to Father.

[4] DCS alleged an additional ground pertaining exclusively to Father.

[5] Father's parental rights were also terminated in the February 9, 2016 order. He did not appeal the termination; thus, his parental rights are not at issue in this case.

## II.    STANDARD OF REVIEW

A parent has a fundamental right to the care, custody, and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651 (1972); *In re Adoption of A.M.H.,* 215 S.W.3d 793, 809 (Tenn. 2007). However, that right is not absolute and may be terminated in certain circumstances. *Santosky v. Kramer*, 455 U.S. 745, 753-54 (1982); *State Dep't of Children's Services v. C.H.K.,* 154 S.W3d 586, 589 (Tenn. Ct. App. 2004). Our termination statues identify "those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re W.B., IV*, No. M2004-00999-COA-R3-PT, 2005 WL 1021618, *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g)). A party seeking to terminate the parental rights of a biological parent must prove at least one of the statutory grounds for termination. Tenn. Code Ann. § 36-1-113(c)(1). In addition, the party must prove that termination of the parental rights of the biological parent is in the child's best interest. Tenn. Code Ann. § 36-1-113(c)(2).

Because of the fundamental nature of the parent's rights and the grave consequences of the termination of those rights, courts must require a higher standard of proof in deciding termination cases. *Santosky*, 455 U.S. at 766-69. Thus, both the grounds for termination and the best interest inquiry must be established by clear and convincing evidence. Tenn. Code Ann. § 36-3-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). Clear and convincing evidence eliminates any serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *Hodges v. S. C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). In light of the heightened standard of proof in these cases, a reviewing court must adapt the customary standard of review set forth by Tenn. R. App. P. 13(d). *In re M.J.B.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). As to the court's findings of fact, our review is *de novo* with a presumption of correctness unless the evidence preponderates otherwise, in accordance with Tenn. R. App. P. 13(d). *Id.* We must then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights. *Id.*

## III.    ABANDONMENT BY INCARCERATION – WANTON DISREGARD

Tennessee Code Annotated § 36-1-113(g)(1) designates abandonment, as defined at section 36-1-102, as a ground for terminating parental rights. Tennessee Code Annotated § 36-1-102 defines "abandonment" for this purpose as follows:

A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or . . . during all or part of the four (4) months immediately preceding the institution of such action or proceeding, . . . or the parent or guardian has

3

engaged in conduct prior to incarceration that exhibits wanton disregard for the welfare of the child[.]

Tenn. Code Ann. § 36-1-102(1)(A)(iv) (2014). This court has stated that Tennessee Code Annotated § 36-1-102(1)(A)(iv) "reflects the commonsense notion that parental incarceration is a strong indicator that there may be other problems in the home that threaten the welfare of the child." *In re Audrey S.*, 182 S.W.3d 838, 866 (Tenn. Ct. App. 2005). Although "[a] parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child," incarceration alone does not satisfy the test for abandonment under section 36-1-102(1)(A)(iv). *Id.* To sustain the ground, the court must find "by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child." *Id.* Accordingly, a parent's incarceration is "a triggering mechanism" that allows the court to "take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.*

The pre-incarceration conduct referred to in Tennessee Code Annotated § 36-1-102(1)(A)(iv) "is not limited to acts during the four-month period immediately preceding the incarceration." *In re Jeremiah T.*, No. E2008-02099-COA-R3-PT, 2009 WL 1162860, at *8 (Tenn. Ct. App. Apr. 30, 2009) (citing *In re Audrey S.*, 182 S.W.3d at 871). "It is well-established that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the child's welfare." *In re C.L.D.*, No. M2008-02805-COA-R3-PT, 2009 WL 1684667, at *6 (Tenn. Ct. App. June 15, 2009) (citing *In re Audrey S.*, 182 S.W.3d at 868).

It is undisputed that Mother was incarcerated at the time DCS filed the petition; the specific issue is whether Mother's conduct prior to incarceration exhibited a wanton disregard for the welfare of the children. Relative to this ground, the termination order concluded:

Subsequent to the children's placement in foster care, [Mother] . . . engaged in criminal behavior that led to [her] incarceration in January 2015 for charges related to burglary. [Mother was] ultimately convicted of theft for these charges. Additionally, thereafter [Mother . . . was] arrested, incarcerated, and convicted of contributing to the delinquency of a minor. . . . [Mother] knew that [her] children were in foster care and the tasks and requirements that needed to be completed in order to reunify with the children. [She] was also aware that [her] failure to do so could lead to termination of [her] parental rights. Despite this knowledge and the efforts

4

of DCS to assist [her] in reunifying with the children, [Mother] . . . continued to fail to comply with the Department and the orders of the Juvenile Court as well as continued to engage in criminal activity which led to the delinquency of a minor. The Court finds that this conduct shows a disregard for the welfare of the children.

Additionally, the Court finds that the conduct of [Mother] in allowing unrelated adults in and out of the family home, which potentially led to the theft of [her] children's medication on two occasions, domestic violence incidents in the home, and drinking and partying in the home, shows the [Mother's] disregard for the welfare of [her] children. The Court finds that the [Mother] chose to engage in this conduct rather than concentrating on [her] parenting and reunifying with [her] children. In addition, the [Mother's] continual violation of this Court's orders regarding unrelated adults and animals in the home exhibits a complete disregard of the children's welfare . . . .

On November 23, 2014, Mother engaged in behavior that ultimately led to her arrest and class A misdemeanor convictions for theft of property valued at $500 or less and contributing to the delinquency of a minor.[6] Although the arrests for these offenses occurred on two separate occasions, the judgment sheets, admitted into evidence during the hearing, indicate that the conduct giving rise to each conviction occurred on November 23, 2014. The only additional evidence in the record that relates to the nature of these two convictions is the testimony of Mr. Ernest Williams, Social Service Family Service Worker employed by DCS, that the contributing to the delinquency of a minor conviction was the result of one of Mother's children, who is not subject to this proceeding, being present in the home in which the stolen property was located. The charges arising from this incident alone do not support the trial court's finding that Mother "*continued* to engage in criminal activity which led to the delinquency of a minor."

In the termination order, the trial court also cites Mother's "continual violation of this Court's orders regarding unrelated adults and animals in the home" as showing wanton disregard for the children. As previously mentioned, only Mother's conduct prior to incarceration, which occurred on January 2, 2015, is relevant to the determination of whether Mother exhibited a wanton disregard for the children.

---

[6] Her arrest on the theft of property charge was on January 2, 2015; she was subsequently arrested on the charge of contributing to the delinquency of a minor on March 17, 2015. On May 14, 2015, Mother pled guilty to theft of property, received pre-trial credit from January 2, 2015 until February 5, 2015, and was sentenced to supervised probation for 11 months and 29 days; she also pled guilty to contributing to the delinquency of a minor, received pre-trial credit from March 17, 2015 until March 19, and was sentenced to 11 months and 29 days of supervised probation to run concurrently with the theft of property sentence.

The trial court entered an interim review order on December 8, 2014 (the "December 8th order"), stating that "[b]ased on a domestic violence incident in the home involving Donald Doss, who is reportedly residing in the home, the Court orders that the mother and father shall allow no contact, either direct or indirect, and the parents shall ensure that Mr. Doss shall not reside in the family home." Mr. Williams testified that on December 11, 2014, he "observed Mr. Doss exiting the bathroom" at the home. No other evidence was offered to show that Mr. Doss was in the home prior to Mother's arrest.

The December 8th order also provided that "any person who is a *frequent overnight guest* in the home, must cooperate with and comply with all requests concerning drug screening and background checks." In the termination order, the trial court found that Mother did not comply with this provision because she allowed three unrelated adults into the home: "Ju-Ju, an underage male who [Father] was drinking and 'partying' with; Gordo O'Connor, an individual who had previous involvement with [DCS]; and Chris or Nick, a person identified as a handy-man fixing a shelf in the family home . . . ."

Mr. Williams testified that on the Friday before the termination hearing, he saw a man at the home who identified himself as Chris; however, this occurred after Mother's incarceration, and is not pertinent to the wanton disregard inquiry. With regard to Ju-Ju, the evidence consisted of Mr. Williams' testimony that "Mr. Donald Doss . . . had been in or around the property on several occasions along with another male . . . Ju-Ju." The only evidence concerning Mr. O'Connor was Mother's testimony that he could have been responsible for one of the children's missing medications, but that Mr. O'Connor had relocated to Florida. There is no evidence showing that these individuals were "overnight guests," a condition precedent to the obligation imposed by the December 8th order; thus, the record does not support the finding that Mother violated this provision of the December 8th order.

The trial court also briefly mentions that Mother violated a court order prohibiting dogs from being in the home. On December 19, 2013, the court rendered an order providing that Mother's home must be "uncluttered . . . with no dogs on the premises." Mr. Williams testified that he made an unannounced visit to the home ten days prior to the hearing and saw a dog on the premises, which Mother said was "her brother's dog, and she was just putting him up[;] and she also said that he would be picking up the dog on the following Monday."

As we analyze this issue, we consider the facts and circumstances surrounding our other decisions where we have sustained a finding of wanton disregard. *See In re Kierra B.*, No. E2012-02539-COA-R3-PT, 2014 WL 118504, at *8 (Tenn. Ct. App. Jan. 14, 2014) (Father showed a wanton disregard for child by engaging in "criminal behavior [that] was serious and detrimental to his child's welfare" and which resulted in him being "absent from [child's] life for most of her childhood"); *In re K.F.R.T.*, 493 S.W.3d 55, 61

6

(Tenn. Ct. App. 2016), *perm. app. denied* (Tenn. June 6, 2016) (finding that father's behavior was part of a broader pattern of conduct that rendered him unfit because he "was arrested for theft, multiple D.U.I. offenses, repeated traffic offenses, domestic violence against the biological mother of the children central to this appeal, multiple illegal border crossings, and even extortion"); *In re Donte N.*, E2013-01617-COA-R3-PT, 2014 WL 201612, at *8 (Tenn. Ct. App. Jan. 17, 2014) (finding that father exhibited a wanton disregard for his children after he failed to comply with the permanency plan and moved out of state, where he was then convicted of several offenses and received two one-year sentences for charges involving minors); *In re C.L.D.*, No. M2008-02805-COA-R3-PT, 2009 WL 1684667, at *7 (Tenn. Ct. App. June 15, 2009) (concluding that mother exhibited a wanton disregard for the children by, among other things, "being arrested approximately forty-seven times," leaving two of the children "with her grandmother who, admittedly, was unable to care for them" and leaving the youngest child "in the care of complete strangers"); *In re Selena L.*, No. E2015-02059-COA-R3-PT, 2016 WL 4056185, at *12 (Tenn. Ct. App. July 27, 2016), *no perm. app. filed* (finding that "Mother's conduct prior to her incarceration, including both her criminal activity and her illegal drug use, clearly and convincingly constituted a wanton disregard for the welfare of the Children"); *In re Charles K. Jr.*, No. M2015-00714-COA-R3-PT, 2016 WL 3036049, at *10 (Tenn. Ct. App. May 19, 2016), *no perm. app. filed* (finding clear and convincing evidence that father showed wanton disregard for the children where father "exhibited a substantial amount of criminal behavior, . . . engaged in domestic violence toward Mother while in the presence of the Children, and . . . failed to address his mental health and substance abuse issues").

While we in no way condone the conduct which led to Mother's incarceration or her violation of the December 19, 2013 order, we are mindful of the higher standard of proof that is required before a party may be deprived of the constitutional right to be a parent to his or her child. The record shows that, despite the lapses in her behavior, Mother has shown a great deal of care and concern for the children, and she has made a genuine effort to establish a meaningful relationship with them. Prior to her incarceration, Mother completed tasks on the permanency plan, spent $800.00 on parenting classes, and attended every visitation with the children that she was permitted. After a thorough examination of the record, we cannot conclude that the evidence of Mother's pre-incarceration conduct clearly and convincingly prove a wanton disregard for the children's welfare. We accordingly reverse the trial court's finding of abandonment by her pre-incarceration conduct as a ground for termination of Mother's parental rights. Further, although testimony was offered at trial that there was a dog on the premises after entry of the order prohibiting the same, we are not convinced that, given the history and circumstances of this case, Mother's conduct in this regard amounts to the level of egregiousness that warrants a finding that Mother exhibited a wanton disregard for the children.

## IV. PERSISTENCE OF CONDITIONS

We next consider whether the trial court erred in holding that clear and convincing evidence had been shown to terminate Mother's parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(3). Under that subsection, parental rights may be terminated on the basis of "persistence of conditions" when:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians, in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3).

The trial court made the following findings relative to this ground:

The children were found by this Court to be dependent and neglected on September 4, 2012 due to environmental neglect, lack of supervision, and consistent instability in the family home after their placement in state custody on May 21, 2012. The children were also in DCS custody for environmental neglect, lack of supervision[], and parenting issues from August 31, 2010 to December 19, 2011.

[Mother . . . has] made little progress in remedying the conditions that led to the removal of the children. The conditions that led to removal in May 2012 are the same issues that led to the removal of the children in August 2010. Additionally there have continued to be hygiene issues and environmental neglect concerning the parents and the children when they are in the care of the parents. These conditions have persisted throughout this custodial episode and persist today.

8

[Mother . . . has] complied with the services and tasks provided . . . by DCS. The parents have participated in multiple rounds of parenting classes and services to address their home environment, however, they remain woefully deficient in their abilities to parent the children and maintain a safe and environmentally appropriate home.

Despite thirty-nine (39) months of DCS providing extensive services, the conditions that led to the removal of the children still persist. [Mother . . . has] completed tasks on the children's permanency plan, but [has] been unable to maintain or demonstrate the ability to properly care for, supervise, or parent the subject-children. Additionally, the parents have failed to demonstrate that they can consistently maintain a healthy and safe environment for the children for an extended period of time. Despite initial progress in establishing a safe and secure home, the parents have repeatedly shown that they are unable to maintain a safe, stable, and appropriate environment for the children, with there being continued environmental neglect issues, lack of supervision issues, and inappropriate persons living in the family home with unrestricted access to the children in violation of the court's continued orders regarding these issues.

DCS did place the children on a ninety (90) day trial home visit on June 16, 2014, to allow [Mother and the children's father] an opportunity to exhibit the skill they had learned through completing the tasks on the permanency plans. The trial home visit was disrupted by DCS on August 29, 2014 due to [Mother and the children's father] failing to ensure the children, who require intensive therapy, were attending regular therapy appointments and medication management appointments; failing to ensure the children attended medical appointments, missing well-check visits for all the children and missing two (2) scheduled appointments for [one child] related to issues concerning the child's weight; failing to ensure regular school attendance by the children; the children's medication coming up missing on two (2) occasions during the trial home visit with the parents providing no explanation to DCS; and there were regularly persons not approved by DCS in and out of the family [home] at all times of the day with free access to the children. These concerns were addressed with [Mother and the children's father] numerous times during the trial home visit, but the parents made no efforts to remedy the issues. These concerns had also been previously addressed by the Court. At the September 4, 2014 hearing regarding the disruption, the Court found that the disruption was appropriate based on continued parenting, supervision, and environmental issues and approved the children being placed back in foster care, ordering the parents to have only supervised visitation with the children.

9

Problems with parenting, supervision, environmental neglect, and providing a stable and safe home environment have persisted . . . . [Mother . . . has] shown [she is] unable to maintain any changes in [her] behavior or lifestyle. The parents have repeatedly displayed during supervised visitation difficulty in parenting and supervising the children and providing structure. [Mother] has never parented any of her children for an extended period of time. Following the children returning home after the initial custodial episode, the children were removed back in to foster care only five (5) months later for issues again relating to supervision, proper parenting, and environmental neglect. It is clear from the history of this case that [Mother . . . is] unable to effectively and appropriately parent and provide [her] children with a safe and stable home environment for any extended period of time.

There is little chance that those conditions will be remedied soon so that the children can be returned safely to the home of the mother . . . because, for thirty-nine (39) months, DCS made extensive reasonable efforts to help [Mother] . . . to remedy them, to no avail. . . .[7]

The final prong is that the continuation of the parent/child relationship greatly diminishes the child's early integration into a safe, stable and permanent home. The testimony by Mr. Williams was that these children have been in the same foster home since May 2012 and were in this home during their initial custody episode in 2010. This is a pre-adoptive home, so an adoption could occur immediately if parental rights are terminated. The children are thriving in the home and have bonded greatly with the resource parents who have continually provided them with a safe, stable, and loving environment.

---

[7] The order continued:

Many of these efforts were even duplicative efforts due to the parents' inability to apply and demonstrate changes in their behaviors after initially completing services. DCS assisted the parents in the completion of services related to parenting classes; DCS has provided in-home homemaker services to address environmental neglect, budgetary, and time management concerns; DCS has assisted the parents in enrolling in Flourishing Families through the University of Tennessee; DCS made referrals regarding the family to the HUGS program; DCS referred Tennessee Early Intervention services to the family to address concerns regarding the children's development and proper parenting techniques; DCS provided transportation and bus passes to assist the parents in attending visitations, doctor's appointment, assessments, and therapy; DCS provided assistance in setting up and providing funding for the parents' psychological evaluation; DCS provided pest control services to the family to rid the home of fleas, ticks, and roaches; and DCS has provided intensive in-home case management throughout the time the children have been in foster care.

Based on the above, the Court finds that clear and convincing evidence shows that the conditions that led to the removal of the children persist . . ., there is little likelihood that these conditions will be remedied at an early date, and as such continuation of the parent/child relationship would greatly diminish the children's chances of being placed in a safe, stable, and permanent home.

It is undisputed that the children had been removed from Mother's home for more than six months. The petition initiating the dependent and neglect proceeding contains a seven page narrative in the "Statements in Support of Petition" section, six of which contain factual allegations; the petition notes that from mid-March 2012 to May 21, 2012, DCS received four referrals relating to the home environment and neglect. The record reflects that Mother waived her right to an adjudicatory hearing and that the children remained in DCS custody. At the termination hearing, Mr. Williams testified at length as to DCS' involvement with Mother, including the period from August of 2010 to December 2011, when two of the three children involved in this proceeding were placed in DCS custody for the same reasons that the 2012 dependent and neglect proceeding was initiated.

Adding context to the court's findings quoted above, Mr. Williams testified to his visits to Mother's home—both announced and unannounced. He testified as follows relative to a June 19, 2015 unannounced visit:

> I conducted an unannounced visit June -- June 19th, and I went to the home. And, of course, when I arrived to the home, there was -- in the front of the yard, I just observed -- it was a lot of trash, loose wood, fencing, toys. It was just a lot of stuff, just trash scattered throughout the front yard.
> And as I was approaching the home, there was just a couple of stray cats just kind of coming to the house as if they were getting ready to go in. I knocked on the door, nobody answered, and I just conducted a walk-through of the outside of the home. And in the fenced in area that they had, it was a lot of toys and trash just piled up in the back yard. Like I said, there was a lot of stray cats just kind of roaming throughout their property.
> And when I went to the back area, I had observed the back door being open and the whole time I was knocking on the front door it was like -- it was a dog, and it was a pit bull, I'm sure it was, that was in the window barking the whole time.

With respect to an announced visit a few days prior to the hearing, Mr. Williams testified:

> A. I actually did a home visit on July the 17th.
> Q. Okay. And tell me about that home visit.

A. When I arrived to the home, there was a lot of things pushed -- well, toward the front of the road. I think they had packed some of the trash up and -- I was just under the impression that somebody would be picking the stuff that was at the front of the house up, but there was still several items scattered out throughout the yard. As far as, like I said, loose -- just wood, pieces of fencing, kids' toys, and just kind of some trash that was just scattered out throughout the front of the yard.

And when I went to the -- I knocked on the door and asked if I can come in the house. [Father] actually answered the door and he allowed me entrance. And when I went inside the home, [Mother], she was trying to -- it appeared that -- it would appear she was wrapping -- taking some clothes and trying to put them in the back, but I asked her what was she doing, and she was wrapping it up. She said that she was -- she had her brother's dog, and she was just putting him up and she also said that he would be picking the dog up the following Monday.

In the back room where she was putting the dog at, her mother was in the home, and she said that her mother had been living with her for a few days. And during my -- during the walk-through of the home, there was still dirty dishes in the house. There were bags -- bags of clothes and trash bagged up, and there was a couple piles of dirt that had been swept up.

I did not observe any animal feces during this visit, but it was like -- it was just a lot of items just scattered, a lot of clutter throughout the whole home. And [Mother] and [Father], they basically said that Ms. Kincaid's brother would be coming to the home to try to haul the stuff off. But she was – she did have a dog in the home. And her mother was just -- she said that her mother had been staying there with her.

Q. What's the concern of Ms. Kincaid's mother?

A. There was a no-contact order for Ms. Kincaid's mother to be around the children.

In addition, Mr. Williams introduced pictures of the home taken on August 26, 2015, showing cats, cat litter, and clutter.

Jared Fuson, who works at New Vision Inc., an agency contracted by DCS to conduct parenting and anger management counseling with Mother and Father, testified that he had visited with Mother and Father on two occasions and that the parents had been "very compliant" with his suggestions to clean up the premises, and that during a visit on July 10, 2015,  "we looked at some of the things that [the parents] were supposed to fix from DCS's inspection and then some of the things that I noticed, [Mother was] able to clean up pretty much everything."  Mother testified relative to pictures taken on August 25 showing the inside and outside of the home.

Upon our review of the testimony and other evidence, and in obedience to the clear and convincing standard we are to apply to the evidence in our review of this case, and with due deference given to the trial court's findings, we affirm the holding that the environmental neglect conditions giving rise to the children's removal persist and would, in all reasonable probability, subject the children to further abuse or neglect. While, as noted earlier in this opinion, the evidence shows that Mother had improved in addressing some of the behaviors she had engaged in that led to her incarceration and in her interaction with the children, the evidence is clear and convincing that she has not maintained a similar level of purpose and commitment with respect to addressing the environmental concerns that led to the children's removal, and that those conditions persist and are not likely to be remedied on a consistent basis in the future.

## V.  BEST INTEREST

After finding that a ground for termination has been established by clear and convincing evidence, the court must then determine if termination is in the best interest of the child. Tenn. Code Ann. § 36-1-113(c)(2). Tennessee Code Annotated § 36-1-113(i) mandates that the following factors be considered in making this determination:

> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
>
> (2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
>
> (3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
>
> (4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
>
> (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
>
> (6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

13

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

The trial court's rationale for concluding that termination was in the children's best interest in large part mirrored the findings that the conditions which led to the children's removal persisted and were not likely to be corrected.[8]  In addition to those circumstances, the trial court reasoned that the children "are in a pre-adoptive home and are bonded with the resource parents"; that they "have been in this home for over three (3) years"; and they are "doing well and thriving in the resource home and deserve stability."

As we consider this issue, we are mindful of the following instruction in *White v. Moody*:

[A]scertaining a child's best interests in a termination proceeding is a fact-intensive inquiry requiring the courts to weigh the evidence regarding the

---

[8]  The trial court noted:

Here, the Court concludes that termination is in the children's best interest.  Considering the factors in TCA 36-1-113(i), the Court finds that [Mother] and [Father] have failed to make an adjustment of circumstance, conduct, or conditions as to make it safe and in the children's best interests to return home.  Although they have complied with services, [Mother] and [Father] have not applied or demonstrated any ability to effectively and safely parent their children and have remained woefully deficient in their abilities to provide a safe, stable, and permanent home for the children.  Additionally, [Mother] and [Father] have continued to engage in criminal activity, resulting in multiple convictions and arrests.  [Mother] and [Father] have failed to effect a lasting adjustment after reasonable efforts by DCS to assist that the lasting adjustment does not reasonably appear possible.  [Mother] and [Father] cannot maintain an environmentally appropriate home, have not shown they can properly supervise and parent the children, and despite completing the permanency plan have provided no reassurance that the children could safely be returned to their care.

14

statutory factors, as well as any other relevant factors, to determine whether irrevocably severing the relationship between the parent and the child is in the child's best interests. The child's best interests must be viewed from the child's, rather than the parent's, perspective.

171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004) (internal citations and footnote omitted).

While the trial court acknowledged Mother's compliance with some of the requirements of the permanency plan, the court placed substantial importance on the facts that the children had been in foster care for over three years, were bonded with the resource parents, and were doing well. The court's findings are supported by the testimony relating to the family's lengthy involvement with DCS and the substantial efforts made by DCS to effect a lasting change in the environment in which the children were being raised. The record supports the finding that Mother had not made a lasting adjustment of the circumstances and, in light of the significant involvement of DCS, that such adjustment did not seem reasonably possible. Moreover, the children were in a safe, stable environment which met their needs. The finding that termination of Mother's parental rights was in the children's best interest is supported by clear and convincing evidence.

## VI. CONCLUSION

For the foregoing reasons, the judgment of the trial court is reversed in part and affirmed in part; the termination of Mother's parental rights on the ground of persistence of conditions is affirmed. The case is remanded to the Juvenile Court of Montgomery County for further proceedings in accordance with this opinion.

_____
RICHARD H. DINKINS, JUDGE