IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 14, 2017 Session

## IN RE AUTHUR R.

**Appeal from the Juvenile Court for Hamilton County**
**No. 269010      Robert D. Philyaw, Judge**

_____

**No. E2017-00782-COA-R3-PT**

_____

This is a termination of parental rights case focusing on the minor child, Authur R. ("the Child"), of Lola R. ("Mother") and Authur D. ("Father"). The Child was placed in protective custody on June 13, 2013, after Mother was discovered to be under the influence of illegal drugs while the Child was in her custody. The Hamilton County Juvenile Court ("trial court") adjudicated the Child dependent and neglected on November 26, 2013. On November 25, 2015, the Tennessee Department of Children's Services ("DCS") filed a petition to terminate the parental rights of both Mother and Father. An amended petition to terminate was subsequently filed on May 6, 2016. DCS alleged as a basis for termination against both parents the statutory grounds of (1) abandonment by willful failure to visit, (2) abandonment by willful failure to support, (3) abandonment by an incarcerated parent, and (4) substantial noncompliance with the reasonable requirements of the permanency plans. Concerning Mother only, DCS also alleged the additional statutory grounds of (1) abandonment by failure to provide a suitable home and (2) persistence of the conditions leading to removal of the Child. Following a bench trial, the trial court granted the petition upon its determination by clear and convincing evidence that DCS had proven as to both parents the statutory grounds of abandonment by an incarcerated parent and substantial noncompliance with the reasonable requirements of the permanency plan. With regard to Mother only, the trial court determined that DCS had also proven by clear and convincing evidence the ground of persistence of the conditions leading to the Child's removal. The trial court further determined by clear and convincing evidence that termination of Mother's and Father's parental rights was in the Child's best interest. Mother and Father have appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and CHARLES D. SUSANO, JR., J., joined.

Cara C. Welsh, Chattanooga, Tennessee, for the appellant, Lola R.

Rachel M. Wright, Hixson, Tennessee, for the appellant, Authur D.

Herbert H. Slatery, III, Attorney General and Reporter, and Michael C. Polovich, Assistant Attorney General, for the appellee, State of Tennessee Department of Children's Services.

Berry Foster, Chattanooga, Tennessee, Guardian Ad Litem.

**OPINION**

I.  Factual and Procedural Background

The Child was born in 2007 to Mother and Father, both of whom were seventeen years of age at the time of the Child's birth.[1]  Both parents subsequently dropped out of high school enrollment.  Although the parents resided together at the time of the Child's birth, they separated after approximately one year.  Thereafter, the Child resided primarily with Mother while Father enjoyed significant visitation.

DCS filed a petition for temporary legal custody in the trial court on June 17, 2013, alleging that the Child was dependent and neglected while in Mother's custody.  In this petition, DCS averred, *inter alia*, that on July 13, 2013, the Child, who was five years of age at that time, was discovered with Mother in the home of Mother's sister, with such home being described as "deplorable and filthy."  Mother was drug screened and found to be under the influence of several illicit substances.  Mother had previously been the subject of a DCS referral when she was discovered in a "filthy" motel room with the Child's younger sibling and had no diapers, clothing, or food for the child.  The Child and his sibling were placed in the temporary custody of DCS.[2]  The trial court subsequently entered an adjudicatory hearing order on November 26, 2013, determining the Child to be dependent and neglected.  This order was based in part on the parents'

---

[1] Although Father's name was not listed on the Child's birth certificate, his paternity was later established by DNA testing.

[2] The Child's sibling was later placed in the custody of his paternal grandmother, and he is not a subject of this action.

stipulation concerning the facts alleged in the petition. The Child was placed in foster care, where he remained through the date of the termination trial.

On November 25, 2015, DCS filed a petition to terminate the parental rights of both Mother and Father in the trial court. An amended petition to terminate was subsequently filed on May 6, 2016. DCS alleged as a basis for termination against both parents the statutory grounds of (1) abandonment by willful failure to visit, (2) abandonment by willful failure to support, (3) abandonment by an incarcerated parent, and (4) substantial noncompliance with the reasonable requirements of the permanency plans. Against Mother only, DCS also alleged the statutory grounds of (1) abandonment by failure to provide a suitable home and (2) persistence of the conditions leading to removal of the Child.

The trial court conducted a bench trial over the course of four days on June 13, 2016; July 14, 2016; September 26, 2016; and October 10, 2016. Several witnesses testified during trial, including the parents; Emetria Arnold, the DCS family service worker; Brian Stoddard, the Child's former therapist; Vivian Squires, the resource coordinator for Omni Visions; and William Hobbs, the DCS mental health practitioner for the region where the Child was located. Both parents admitted during their testimony to incurring criminal charges and repeated incarcerations since the Child's birth. Ms. Arnold testified that following the Child's removal into DCS custody, Mother had been incarcerated during the time periods spanning July 15 to July 16, 2013; July 22 to July 29, 2014; April 10 to April 16, 2015; July 8 to August 14, 2015; and April 4 to June 2, 2016. Father had likewise been incarcerated from April 19 to April 22, 2013; September 17 to October 3, 2013; October 18 to November 27, 2013; January 17 to February 4, 2014; March 12 to March 27, 2014; June 18 to June 27, 2014; January 28 to February 13, 2015; and February 9 through the first day of trial (June 13) in 2016. Ms. Arnold further testified regarding an ongoing issue with drug dependency concerning both parents. Mother had entered treatment for her substance abuse shortly before the termination trial began; Father had never undergone treatment for his substance abuse.

Ms. Arnold explained that despite her efforts to assist the parents, neither Mother nor Father had substantially complied with the reasonable responsibilities of their permanency plans. The parents affirmed at trial that they were familiar with the responsibilities of their plans. Despite their knowledge of the responsibilities, however, Ms. Arnold reported that the parents had, prior to the filing of the termination petition, failed to maintain safe and stable housing, maintain stable employment, rectify their substance abuse issues, avoid further criminal behavior, or visit or support the Child. The Child, who had been diagnosed with Obsessive-Compulsive Disorder, Post-Traumatic Stress Disorder, Attention Deficit Hyperactivity Disorder, and attachment disorder, had been placed on multiple medications to alleviate his behavioral issues. Due to such

behavioral issues, the Child had recently been placed into a fifth foster home by the conclusion of the termination trial. While Ms. Arnold opined that the Child needed stability and permanency, she articulated that the parents were incapable of providing for his needs. Ms. Arnold and Ms. Squires both related that the parents had demonstrated an ongoing lack of communication with DCS regarding their whereabouts, which, in addition to the parents' ongoing legal issues, had hindered DCS's efforts to assist the parents.

Upon conclusion of the trial on the merits, the trial court determined that DCS had proven the ground of abandonment by an incarcerated parent with regard to both parents by clear and convincing evidence. *See* Tenn. Code Ann. §§ 36-1-102(1)(A)(iv), 36-1-113(g)(1). The court found that both parents were incarcerated during all or part of the four months prior to the filing of DCS's amended petition to terminate. The court further found that both parents engaged in conduct prior to their respective periods of incarceration through which they exhibited wanton disregard for the welfare of the Child by failing to remain drug free and by continuing to commit criminal acts. The court also determined that since the Child's birth, Mother had incurred criminal convictions for criminal impersonation, disorderly conduct, vandalism, false reports, and possession of drug paraphernalia. In April 2016, Mother was incarcerated for a violation of probation. The trial court found that Father had also been in and out of jail during the time the Child was in DCS custody, having been sentenced to six years for theft. The court noted that both parents had failed drug screens prior to their respective incarcerations.

The trial court also determined that DCS had proven by clear and convincing evidence the ground of substantial noncompliance with permanency plans with regard to both parents. *See* Tenn. Code Ann. §§ 36-1-113(g)(2), 37-2-403(a)(2). The court determined that although the responsibilities set forth in the plans were aimed at remedying the conditions necessitating foster care, and despite efforts by DCS to assist the parents, both parents failed to comply with those reasonable responsibilities. The court noted that prior to the termination petition's filing, Mother had failed to complete alcohol and drug treatment, pass random drug screens, avoid incarceration, maintain contact with DCS, maintain stable housing or employment, receive proper mental health treatment, or regularly visit the Child. The court also noted that DCS made reasonable efforts to assist Mother by attempting to maintain contact with her, arranging for her alcohol and drug treatment, arranging for her mental health assessment and treatment, providing a bus pass and other means of transportation, sending applications to the housing authority, applying for food stamps on Mother's behalf, and providing in-home services on two different occasions. Notwithstanding these efforts, Mother failed to appear for her scheduled appointments and failed to complete the responsibilities required by her permanency plans prior to the filing of the termination petition.[3]

---

[3] Mother did complete certain plan responsibilities after the filing of the termination petition.

Similarly, the trial court found that Father had failed to comply with the reasonable responsibilities set forth in his permanency plans despite efforts to assist by DCS. Based on the evidence, the court determined that Father failed to complete drug and alcohol treatment, pass random drug screens, avoid incarceration, maintain contact with DCS, maintain stable housing and employment, or regularly visit with the Child. The court also found that DCS made reasonable efforts to assist Father by attempting to maintain contact with him, arranging for his alcohol and drug assessment, and arranging for his mental health assessment.

In addition, the trial court concluded that DCS had proven the ground of persistence of the conditions leading to the Child's removal by clear and convincing evidence relative to Mother. *See* Tenn. Code Ann. § 36-1-113(g)(3). In support, the court noted that the Child had been removed from Mother's custody and home for a period of more than six months and that the conditions leading to removal still persisted. The court found little likelihood that the conditions would be remedied at an early date so that the Child could be returned to Mother's custody. The court reiterated that prior to the termination petition, Mother failed to complete alcohol and drug treatment; pass random drug screens; prevent incarceration; maintain contact with DCS; or maintain stable housing, stable employment, or regular visitation with the Child. The court noted that Mother had made no progress toward the goals of her permanency plans until 2016.

The trial court also determined by clear and convincing evidence that termination of Mother's and Father's parental rights was in the Child's best interest. Finding that the Child had lingered in foster care since June 2013, the court observed that the Child was eight years old, adoptable, and in need of permanence. The court also found that the parents had failed to make a lasting adjustment of their circumstances so as to make it safe for the Child to be placed in their care. As the court explained: "[The Child] has had enough of the unknown. This unknown hope that his parents are going to somehow do what they need to do needs to be out of the picture, so that he can focus on himself and the services can be clearer for him." The court further determined that the parents had not maintained regular visitation with the Child, such that there was no meaningful parent-child relationship, only "fondness" and "some emotional connection." According to the court, the parents' respective homes were not suitable for the Child due to their criminal activity and drug use, and the parents were unable to care for the Child in a safe and stable manner.

Based on these findings and conclusions, the trial court terminated the parental rights of both parents. Mother and Father each timely appealed.

## II. Issues Presented

Mother presents the following issues for our review, which we have restated slightly:

1. Whether the trial court erred in determining by clear and convincing evidence that Mother engaged in conduct prior to her incarceration exhibiting a wanton disregard for the welfare of the Child.

2. Whether the trial court erred by determining that clear and convincing evidence supported the ground of substantial noncompliance with the reasonable requirements of the permanency plans regarding Mother.

3. Whether the trial court erred by determining that clear and convincing evidence supported the ground of persistence of the conditions leading to removal of the Child regarding Mother.

4. Whether the trial court erred in determining by clear and convincing evidence that termination of Mother's parental rights was in the Child's best interest.

5. Whether the trial court erred by failing to address the likelihood of the Child's adoption in the best interest analysis.

6. Whether the trial court erred by failing to address the loss of sibling relationships in the best interest analysis.

Father presents the following additional issues, which we have also restated slightly:

7. Whether the trial court erred in determining by clear and convincing evidence that Father engaged in conduct prior to his incarceration exhibiting a wanton disregard for the welfare of the Child.

8. Whether the trial court erred by determining that clear and convincing evidence supported the ground of substantial noncompliance with permanency plans regarding Father.

9. Whether the trial court erred in determining by clear and convincing evidence that termination of Father's parental rights was in the Child's best interest.

### III. Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. Tenn. R. App. P. 13(d); *see In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530. Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 393 (Tenn. 2009)). The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett,* 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)). As our Supreme Court has recently explained:

> The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decison terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

"Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

* * *

In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Grounds for Termination of Parental Rights

Tennessee Code Annotated § 36-1-113 (2017) lists the statutory grounds for termination of parental rights, providing in relevant part as follows:

(a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c) Termination of parental or guardianship rights must be based upon:

(1)     A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)     That termination of the parent's or guardian's rights is in the best interests of the child.

The trial court determined that the evidence clearly and convincingly supported three statutory grounds to terminate Mother's parental rights: (1) abandonment by an incarcerated parent pursuant to Tennessee Code Annotated §§ 36-1-102(1)(A)(iv) and 36-1-113(g)(1), (2) substantial noncompliance with the reasonable requirements of the permanency plan pursuant to Tennessee Code Annotated § 36-1-113(g)(2), and (3) persistence of the conditions leading to the Child's removal pursuant to Tennessee Code Annotated § 36-1-113(g)(3). The court further determined that the evidence clearly and convincingly supported the termination of Father's parental rights based on the statutory grounds of abandonment by an incarcerated parent and substantial noncompliance with the reasonable requirements of the permanency plan. We will address each of these statutory grounds in turn.

A.  Abandonment by an Incarcerated Parent

Regarding this ground, Tennessee Code Annotated § 36-1-113(g)(1) provides in relevant part:

(g)     Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1)     Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

There is no dispute that both Mother and Father were incarcerated for a portion of the four-month period preceding the amended termination petition's filing; accordingly, the definition of abandonment contained within Tennessee Code Annotated § 36-1-102(1)(A)(iv) (Supp. 2015) applies.[4] This subdivision provides in pertinent part:

---

[4] We note that the ground of abandonment by an incarcerated parent was not alleged as to Mother or Father until the filing of the amended petition.

9

(iv)    A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child.

Pursuant to this definition, the determinative period applicable to the grounds of willful failure to support and willful failure to visit begins four months immediately preceding incarceration. *See id.* We note, however, that a parent's actions demonstrating wanton disregard for the welfare of a child are not restricted to only the four-month period prior to incarceration. *See In re Audrey S.,* 182 S.W.3d 838, 871 (Tenn. Ct. App. 2005).

With regard to Mother, the trial court found that she engaged in conduct prior to her incarceration that exhibited wanton disregard for the welfare of the Child by failing to remain drug free and by continuing to commit criminal acts. The court also determined that following the Child's birth, Mother had incurred criminal convictions for criminal impersonation, disorderly conduct, vandalism, false reports, and possession of drug paraphernalia. According to the court, in April 2016, Mother was again incarcerated for a violation of probation.

Similarly, the trial court found that Father had engaged in conduct prior to his incarceration that exhibited a wanton disregard for the welfare of the Child. As the court noted, Father, having been sentenced to six years for theft, was in and out of jail during the entire period the Child had been in DCS custody. The court further noted that both parents had failed drug screens prior to their respective incarcerations.

Based upon our thorough review of the record, we determine that the evidence presented supports the trial court's findings. Mother and Father admitted to their numerous criminal charges and periods of incarceration while testifying during the termination trial. Furthermore, Ms. Arnold testified that Mother failed (or refused) drug screens on July 11, 2013; December 12, 2013; January 15, 2014; February 21, 2014; March 7, 2014; June 2, 2014; and October 15, 2014. Moreover, Mother admitted that she consistently used illicit drugs until early 2016 when she entered a rehabilitation program. According to Ms. Arnold, Father failed drug screens administered on July 11, 2013, and April 7, 2014. Ms. Arnold further related that Father participated in an alcohol and drug

assessment at Bradford Health Services on February 28, 2014, and denied using illicit drugs despite testing positive for cocaine. No proof was presented that Father had ever completed drug or alcohol treatment.

In addition to the criminal charges delineated by the trial court in its order, Father testified that he had been charged with the use of stolen plates and that he was incarcerated on the first day of the termination trial due to a contempt charge. During a later trial date, Father admitted that he was released from incarceration for approximately one month in July 2016 but was arrested again on September 15, 2016. When questioned concerning his recent arrest, Father refused to answer, invoking his Fifth Amendment right to remain silent. Ms. Arnold testified that she learned of Father's arrest from a television news report. Similarly, Mother admitted during the September 26, 2016 hearing that she gave birth to another baby on September 15, 2016, and was arrested three days later due to "missing paperwork."

This Court has consistently held that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.,* 182 S.W.3d at 867-68; *see also In re K.F.R.T.,* No. E2015-01459-COA-R3-PT, 2016 WL 908926, at *4 (Tenn. Ct. App. Mar. 10, 2016). "Simply stated, a parent's 'poor judgment and bad acts that affect the children constitute a wanton disregard for the welfare of the children.'" *In re T.L.G.*, No. E2014-01752-COA-R3-PT, 2015 WL 3380896, at *3 (Tenn. Ct. App. May 26, 2015) (quoting *State, Dep't of Children's Servs. v. Hood*, 338 S.W.3d 917, 926 (Tenn. Ct. App. 2009)). In this action, DCS presented ample evidence of the parents' repeated incidents of criminal behavior and probation violations, resulting in repeated incarcerations. Considerable evidence also demonstrated the parents' substance abuse, which resulted in the cessation of Mother's visits with the Child in 2014. Father had likewise failed to visit the Child for more than a year due to his repeated incarceration. We determine that the trial court properly found clear and convincing evidence of the parents' abandonment of the Child by engaging in conduct prior to incarceration that exhibited a wanton disregard for the welfare of the Child. We therefore affirm the trial court's reliance upon this statutory ground for termination of the parents' rights to the Child.

B. Substantial Noncompliance with Permanency Plans

The trial court also found clear and convincing evidence that Mother and Father failed to substantially comply with the reasonable responsibilities set out in the permanency plans. Tennessee Code Annotated § 36-1-113(g)(2) provides as an additional ground for termination of parental rights:

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4; . . . .

Upon our thorough review of the record, we determine that the trial court properly found clear and convincing evidence demonstrating that Mother had failed to substantially comply with the reasonable responsibilities set out in the permanency plans. As the trial court determined, the proof showed that prior to the filing of the termination petition, Mother had failed to complete alcohol and drug treatment, pass random drug screens, avoid incarceration, maintain contact with DCS, maintain stable housing or employment, receive proper mental health treatment, or regularly visit the Child. The court also noted that DCS made reasonable efforts to assist Mother by attempting to maintain contact with her, arranging for her alcohol and drug treatment, arranging for her mental health assessment and treatment, providing a bus pass and other means of transportation, sending applications to the housing authority, applying for food stamps on Mother's behalf, and providing in-home services on two different occasions. Despite these efforts, Mother failed to appear for her scheduled appointments and failed to complete the responsibilities required by her plans prior to the filing of the termination petition. Although DCS offered Mother drug rehabilitation treatment on various occasions, Mother did not avail herself of those opportunities until 2016.

Similarly, the trial court found that Father had failed to comply with the reasonable responsibilities of his permanency plans despite efforts to assist by DCS. Having carefully reviewed the record, we agree. There was no proof that Father had ever completed drug and alcohol treatment. In addition, Father failed to pass random drug screens, avoid incarceration, maintain contact with DCS, maintain stable housing and employment, or regularly visit with the Child. The court found that DCS made reasonable efforts to assist Father by attempting to maintain contact with him, arranging for his alcohol and drug assessment, and arranging for his mental health assessment. Although Father did comply with the mental health assessment, he refused any related therapy or case management. DCS's efforts were substantially limited by Father's repeated periods of incarceration and his lack of communication with Ms. Arnold.

According to Ms. Arnold, Father would not cooperate with her attempts to schedule appointments and acted as though he was in denial regarding the serious nature of the situation. Although Father visited with the Child near the beginning of the custody period, Father missed more visits than he attended. He eventually ceased contact with DCS such that visits could not be arranged. Based upon the evidence presented, we conclude that the trial court properly terminated the parental rights of Mother and Father based upon clear and convincing evidence of this statutory ground as well.

C.  Persistence of Conditions Leading to Removal

The trial court determined that the ground of persistence of the conditions leading to the Child's removal from Mother's home had been proven by clear and convincing evidence.  Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) provides:

(3)    The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

    (A)    The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

    (B)    There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

    (C)    The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

In its final judgment, the trial court noted that the Child had been removed from Mother's custody for a period of more than six months and that the conditions leading to removal still persisted.  The court found little likelihood that the conditions would be remedied at an early date so that the Child could be returned to Mother's custody.  The court again noted that prior to the filing of the termination petition, Mother failed to complete alcohol and drug treatment; pass random drug screens; prevent incarceration; maintain contact with DCS; or maintain stable housing, stable employment, or regular visitation with the Child.  The court observed that Mother had made no progress on her permanency plans until 2016.

Having thoroughly reviewed the record in this matter, we agree that the evidence preponderates in favor of these findings.  The Child had been in DCS custody for three years by the time of the termination trial.  Mother made virtually no effort to improve her circumstances until 2016, despite the fact that her visitation with the Child had been halted in 2014 until she underwent drug treatment.  Before 2016, Mother continued to fail drug screens and incur criminal charges, and she failed to procure stable housing or

13

employment. By the end of the termination trial in September 2016, Mother was once again incarcerated.

Although Mother claimed that she planned to make a home with her youngest child's alleged father upon her release from jail, Mother presented no definitive proof regarding her plans. Mother's lack of progress following three years of efforts by DCS is indicative of the improbability of Mother's successfully parenting the Child at an early date. Furthermore, the Child's former therapist testified that the Child struggled in his foster placements because he held out hope that his parents would regain custody. Thus, continuation of the parent and child relationship greatly diminished the Child's chances of early integration into a safe, stable, and permanent home. We determine that the trial court properly found clear and convincing evidence of persistence of the conditions leading to the Child's removal with regard to Mother.

Mother asserts that this ground was improperly applied because she was homeless at the time of the Child's removal, such that the Child was not removed from her "home" as required by the above statutory section. Mother relies on this Court's opinion in *In re Mickia J.*, No. E2016-00046-COA-R3-PT, 2016 WL 5210794 (Tenn. Ct. App. Sept. 19, 2016), in support of this argument. We determine Mother's reliance on *Mickia J.* to be misplaced. In *Mickia J.*, the father, whose rights were terminated based on the ground of persistence of conditions, was incarcerated at the time of the child's birth, and he remained incarcerated at the time the child began living with the petitioners at approximately eleven days old. *See id*. at \*1, \*5. Therefore, as this Court explained, the child "was not removed from Appellant's custody or home . . . ." *See id*. at \*1. The *Mickia J.* Court relied upon this Court's opinion in *In re Maria B.S.*, No. E2012-01295-COA-R3-PT, 2013 WL 1304616, at \*11 (Tenn. Ct. App. Apr. 1, 2013), wherein the incarcerated father advanced a similar argument. In *Maria B.S.*, the children had been removed from their incarcerated mother shortly after birth. *See id*. at \*1.

In both *Mickia J.* and *Maria B.S.*, this Court determined that the ground of persistence of conditions was inapplicable without a showing that the children were removed from the respondent parent's custody or "home." *See In re Mickia J.*, 2016 WL 5210794, at \*5; *In re Maria B.S.*, 2013 WL 1304616, at \*11. Because the respondent parents in both cases had never had custody of the child(ren) at issue, this Court noted that the child(ren) could not have been removed from the respondent parents' homes as required by the statute. *See id*. As the Court in *Maria B.S.* explained: "No one removed the Children from Father—he never had the Children in the first place." 2013 WL 1304616, at \*11.

By contrast, in the case at bar, it is undisputed that the Child was in Mother's custody from the time of his birth until his removal, such that he was clearly removed

from her "home." The fact that Mother was "homeless" and living in a motel does not alter this analysis. *See, e.g., In re Cheyenne E.H.,* No. M2012-01657-COA-R3-PT, 2013 WL 870658, at *7 (Tenn. Ct. App. Mar. 7, 2013) (affirming the trial court's determination that clear and convincing evidence supported the ground of persistence of the conditions leading to removal of the children when one basis for removal was that the mother was homeless); *In re Ryan B.,* No. E2008-01257-COA-R3-PT, 2009 WL 211882, at *1 (Tenn. Ct. App. Jan. 29, 2009) (affirming the trial court's determination that clear and convincing evidence supported the ground of persistence of the conditions leading to removal of the children when one basis for removal was that the parents were homeless). We therefore determine Mother's argument in this regard to be unavailing. We accordingly affirm the trial court's finding by clear and convincing evidence that the conditions leading to removal of the Child from Mother's home persisted.

## V. Best Interest of the Child

When at least one ground for termination of parental rights has been established, as here, the petitioner must then prove by clear and convincing evidence that termination of the parent's rights is in the child's best interest. *See White v. Moody,* 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). When a parent has been found to be unfit by the establishment of a ground for termination, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.,* 182 S.W.3d at 877. Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White,* 171 S.W.3d at 194.

Tennessee Code Annotated § 36-1-113(i) lists the following factors for consideration:

(1)     Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2)     Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3)     Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4)     Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

15

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Regarding the best interest analysis in this matter, the trial court found:

The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, in that the Respondents, [Mother] and [Father], have failed to make a lasting adjustment of their circumstances to make it safe and in the child's best interest to be placed in their care. This child has lingered in foster care since June 2013. He is eight (8) years old. He is adoptable and he needs permanence. He has had enough of the unknown. This unknown hope that his parents are going to somehow do what they need to do needs to be out of the picture, so that he can focus on himself and the services can be clearer for him.

The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be

granted, in that the Respondents, [Mother] and [Father], have failed to make a lasting adjustment of their circumstances after the state has made reasonable efforts to help them for such duration of time that lasting adjustment does not reasonably appear possible.

The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, as there is no meaningful relationship between the Respondents, [Mother] and [Father], and the child. While there is a fondness and there is some emotional connection, there is no meaningful relationship.

The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, in that the Respondents, [Mother] and [Father], have not maintained contact or regular visitation with the child.

The Court finds clear and convincing evidence, pursuant to T.C.A. § 36-1-113(i), that it is in the child's best interest for termination to be granted, as the physical environment of the Respondents' home is unhealthy and unsafe due to their ongoing criminal activity and the use of alcohol or controlled substances, which renders the Respondents consistently unable to care for the child in a safe and stable manner.

(Paragraph numbering omitted.) Based on our thorough review of the record, we agree with the trial court's findings. We further agree that the best interest of the Child mandate termination of the Mother's and Father's parental rights in this matter, based on an analysis of the proof presented in light of the statutory factors.

Mother and Father both argue that the trial court failed to consider the likelihood of the Child's adoption in its best interest analysis. We note, however, that prior to the foregoing findings relative to the best interest analysis, the trial court also specifically found in its final order:

The child's former Omni Community Health in-home therapist, Brian Stoddard, a licensed professional counselor, testified that he first met the subject child in 2013 when he worked as a team leader at Omni Visions. Prior to joining Omni Community Health, Mr. Stoddard became the child's Omni Resource Coordinator because he had been so involved with the case as a team leader. As a Resource Coordinator, Mr. Stoddard was providing case management services, including making sure that the child gets to his therapy and doctors' appointments. He also facilitated the family's

17

visitation. When he moved to Omni Community Health, Mr. Stoddard began in-home therapy with the child every week to every other week for about six (6) months up until he left Omni at the end of March 2016. For about three (3) months, Mr. Stoddard also did intensive Comprehensive Child and Family Treatment (CCFT) in the home up to three (3) times each week.

Mr. Stoddard testified that the child had issues when his inability to focus and concentrate led to him not understanding what was going on, which caused him to act out, destroy his room, throw fits at school, and throw items. Mr. Stoddard opined that the child acted out of impulse, not necessarily aggression towards somebody in particular. When the child is not in those moments, the child is very kind, fun to be around, and very athletic. Mr. Stoddard described the child as an energetic, fun kid. Mr. Stoddard testified that his therapy services overlapped with those provided by Nancy Rose, who was working with the child to create a greater ability to attach and express emotions.

Mr. Stoddard focused his treatment goals around the child's diagnosis of ADHD. He believed that if he tried to help the child learn how to slow down in those moments of anger, the child would be able to more appropriately process. Further, he and the child had a lot of conversations on attachment and what it looks like to be a part of a family and care for people. Mr. Stoddard testified that the child responded well to him, but he always felt that the child's medications were not where they needed to be. There were days when the child did well and days when he was out of control. Mr. Stoddard testified that the child struggles to trust those around him, and, as result, that gets in the way of his feeling really emotionally attached to those that are involved in his case. While Mr. Stoddard believes the child has attachment issues, he does not believe that the child suffers from Reactive Attachment Disorder (RAD) because a pre-qualifier for RAD is no attachment whatsoever at a very young age. For better or worse, the child had adults in his early infancy years.

* * *

Mr. Stoddard testified that he believes the child is adoptable, and that age and maturity will help his behaviors.

* * *

18

FSW Arnold informed the Court that the child had disrupted his placement over the summer. His foster parents, [S.] and [A.], reported that they felt like they were in an abusive relationship, that he was abusing them. There were multiple attempts to preserve the placement. FSW Arnold testified that the foster parents were very patient and did everything they could. She reported that the child was moved from their home on August 13, 2016. He is now placed in the pre-adoptive home of [Mr. B.] Since being placed in Mr. [B.'s] home, the child is doing well. He has had up and down days where he does not want to go to bed. She reported that the child's behaviors always stem around [electronic] tablets, especially when his tablet is taken away. FSW Arnold testified that the child is doing well in school. His teacher reported that he is at the top of his class in school. He has had only one (1) behavioral issue. The child continues to have therapy with Tim Todd, who has reported that [the Child] is not an engaging child in therapy. Mr. Todd is referring the child back to Nancy Rose for play therapy. The child also continues to see Dr. Sims for medication management, and his medication has been adjusted again due to concerns that the Ritalin was causing aggressive behaviors.

(Paragraph numbering omitted.)

We note that the proof introduced in this matter supports the above findings. Both Mr. Stoddard and Ms. Arnold testified that the Child was adoptable. Mr. Stoddard explained that the Child struggled with trusting and bonding to others because of the trauma he had endured in the past. Mr. Stoddard stated that he believed the Child would benefit from permanency, as would any child, and that his negative behaviors would improve with age and greater maturity.

Ms. Arnold testified that the Child was doing well in his latest placement with Mr. B., which she described as a pre-adoptive home. Ms. Arnold explained that the Child's medications were adjusted a few months before the hearing date, which had improved his behaviors for a period of time. When specifically questioned regarding the Child's adoptability, Ms. Arnold replied that she believed the Child could be adopted, explaining that DCS employed a specialist who would work to fulfill his needs. According to Ms. Arnold, Mr. B. had previously experienced success parenting children who were older and "harder" than the Child, and she stressed that Mr. B.'s home was pre-adoptive. Ms. Arnold further stated: "I really do think Authur's adoptable, because I think his good outweighs his bad moments."

Moreover, William Hobbs, a mental health practitioner for DCS, testified that he consulted on cases where there existed some type of behavioral problem, as with the

Child. Mr. Hobbs explained that approximately eighty children in the region had advanced-level needs, many of whom were not in adoptive placements. According to Mr. Hobbs, the Child had "a lot more options" because he was currently in a pre-adoptive foster home as compared to a group-care home. In summary, all of the evidence presented supports a determination that the Child is an adoptable child. We determine the parents' issue in this regard to be without merit.

Mother and Father likewise argue that the trial court failed to consider the loss of sibling relationships in its best interest analysis. We note, however, that this issue was also specifically addressed by the testimony at trial. For example, both Ms. Arnold and Vivian Squires, the case worker for Omni Visions who facilitated visitation in this matter, testified that the Child was able to visit with his half-sibling, Aiden, approximately twice per month. Ms. Arnold testified that she would continue to foster a relationship between the Child and Aiden even if the parents' rights were terminated. We therefore determine this issue also to be without merit. Having carefully considered the record, we determine that clear and convincing evidence exists that termination of Mother's and Father's parental rights is in the Child's best interest.

## VI. Conclusion

For the foregoing reasons, we affirm the judgment of the trial court terminating the parental rights of Mother and Father in all respects. Costs on appeal are taxed to the appellants, Lola R. and Authur D. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment and collection of costs assessed below.

_____
THOMAS R. FRIERSON, II, JUDGE

20