# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs October 1, 2018

## IN RE JOHNATHAN M. ET AL.

**Appeal from the Circuit Court for Macon County**
**No. 2017-CV-86     Clara W. Byrd, Judge**

_____

### No. M2018-00509-COA-R3-PT

_____

Mother appeals the termination of her parental rights. The trial court found the petitioners proved two grounds for termination, "abandonment by an incarcerated parent and exhibition of wanton disregard for the welfare of the children, prior to and during incarceration, pursuant to Tenn. Code Ann. § 36-1-102." We conclude the record contains insufficient evidence to establish that Mother failed to visit or support the children for four consecutive months immediately preceding her incarceration. However, we affirm the trial court's determination that Mother engaged in conduct prior to incarceration that exhibited a wanton disregard for the children's welfare. Nonetheless, we have determined that the petitioners failed to prove by clear and convincing evidence that termination of Mother's parental rights is in the children's best interests. Accordingly, we vacate the judgment of the trial court to terminate Mother's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Vacated**

FRANK G. CLEMENT JR., P.J., M.S., delivered the opinion of the Court, in which CHARLES D. SUSANO JR. and BRANDON O. GIBSON, JJ., joined.

Jacquelyn M. Scott, Carthage, Tennessee, for the appellant, Destiny M.[1]

Christi Lynn Dalton, Lafayette, Tennessee, for the appellees, Joshua M. and Brittany M.

Lisa C. Cothron, Lafayette, Tennessee, Guardian ad Litem.

_____

[1] This court has a policy of protecting the identity of children in parental termination cases by initializing the last names of the parties.

## OPINION

Johnathan and Jordan M. ("the Children") were born in March 2009 and June 2011, respectively, to Joshua M. ("Father") and Destiny M. ("Mother"). Father and Mother divorced in November 2011 and shared custody of the Children until Mother was incarcerated in October 2014. Three years later, on August 2, 2017, Father and his wife Brittany M. ("Stepmother") filed a petition to terminate Mother's parental rights and for adoption by Stepmother.

Petitioners alleged, *inter alia*, that Mother willfully failed to provide financial support for or to visit the Children since Petitioners obtained physical custody. Petitioners also alleged that "prior to [Mother's] incarceration [in October 2014], she engaged in conduct to exhibit a wanton disregard for the welfare of the minor children, by committing criminal acts." The evidence that Petitioners presented to establish this ground included the following.

Mother was arrested for shoplifting at Walmart in 2011.[2] The charges were dismissed after Mother agreed to stay away from the store.

On June 15, 2012, while employed at the Sumner County Jail as a custodial officer, Mother stole a ring from the jail's property room and sold it to the Westmoreland Gun & Pawn Shop. On February 7, 2013, Mother pled guilty in the Criminal Court of Sumner County in case number CR573-2012 to two counts of theft, the Class D felony offense of theft of property over $1,000, and the Class A misdemeanor offense of theft of property under $500. She received a four-year sentence for the felony, and a concurrent sentence of eleven months and 29 days for the misdemeanor, both of which were suspended, and Mother was placed on supervised probation.

On August 28, 2012, Mother was charged with driving on a suspended license. On December 19, 2012, Mother pled guilty to the Class C misdemeanor offense of driving on a suspended license for which she received a sentence of 30 days, all of which was suspended.

On June 25, 2013, a warrant for probation violation was filed in the Criminal Court for Sumner County in case number CR573-2012 (the jail and pawn shop thefts). By order entered on December 19, 2013, upon Mother's plea of guilty to violating

---

[2] The date of this incident is not in the record.

- 2 -

probation, the criminal court revoked her probation "to time served," which was from December 7 to December 16, 2013, and returned Mother to supervised probation.

On January 29, 2014, Mother participated in the robbery of Sweet T's Restaurant in Sumner County along with her mother and brother. On July 17, 2014, Mother pled guilty in the Criminal Court of Sumner County in case number CR223-2014 to the Class A misdemeanor offense of theft of property under $500 for which she received a sentence of 11 months and 29 days, all of which was suspended, and she was placed on supervised probation.

One month earlier, on June 27, 2014, Mother was again arrested for driving on a suspended license. She entered a guilty plea on September 24, 2014, to the Class B misdemeanor offense of driving on a suspended license, for which she received a six month sentence, all of which was suspended.

Mother was charged with the misdemeanor offense of child neglect in Clay County in 2014. The record does not include an arrest warrant or judgment for this incident and Mother did not recall the month this occurred. Nevertheless, Mother testified that she was charged with failing to seek medical care for her boyfriend's minor child after he "busted his lip." Mother pleaded guilty to the offense of child neglect in June 2015.

On September 25, 2014, a warrant for probation violation was filed in case number CR573-2012 (the jail and pawnshop thefts). Mother was served with this warrant and placed in jail on October 8, 2014, for violation of probation. On June 25, 2015, while Mother remained in jail, a warrant for probation violation was filed in case number CR223-2014 (the Sweet T's robbery). Following a hearing on both matters, by separate orders entered on August 31, 2015, the criminal court revoked Mother's probation in both cases and ordered that the sentences run consecutively.

The August 31, 2015 orders also reveal that Mother had been arrested and incarcerated multiple times over the two years preceding her latest incarceration. The orders list the dates of her arrests as follows:

From 7-12-12 to 7-12-12
From 8-10-13 to 8-10-13
From 12-7-13 to 12-16-13
From 4-2-14 to 4-2-14
From 5-9-14 to 5-9-14
From 10-8-14 to "present" [meaning August 31, 2015, the date of the order]

Following a two-day trial, in which Petitioners and Mother testified and numerous exhibits were introduced into evidence, the Macon County Circuit Court found that

Petitioners proved by clear and convincing evidence that the "[p]etition to terminate the parental rights of [Mother] should be sustained, upon abandonment by an incarcerated parent and exhibition of wanton disregard for the welfare of the children, prior to and during incarceration, pursuant to Tenn. Code Ann. § 36-1-102." The court also found that terminating Mother's parental rights was in the Children's best interests because Mother had not maintained regular contact with the Children, had no meaningful relationship with the Children, made no adjustment of circumstances, and because a change in caretakers and physical environment would have a negative effect on the Children. This appeal followed.

Two issues are properly before this court: (1) whether the trial court erred in finding that Petitioners proved grounds for termination by clear and convincing evidence; and (2) whether the trial court erred in finding that termination of Mother's parental rights is in the Children's best interests.[3]

## STANDARD OF REVIEW

"To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006) (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002)). And, trial courts must make specific findings of fact and conclusions of law. Tenn. Code Ann. § 36-1-113(k). Specific findings of fact and conclusions of law "facilitate appellate review and promote just and speedy resolution of appeals." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005). When a trial court fails to comply with this requirement, appellate courts "must remand the case with directions to prepare the required findings of fact and conclusions of law." *Id.* (citing *In re D.L.B.,* 118 S.W.3d 360, 367 (Tenn. 2003); *In re K.N.R.,* No. M2003-01301-COA-R3-PT, 2003 WL 22999427, at *5 (Tenn. Ct. App. Dec. 23, 2003)).

We review a trial court's findings of fact de novo upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." *In re F.R.R., III*, 193 S.W.3d at 530 (quoting Tenn. R. App. P. 13(d)). However, the heightened burden of proof in termination proceedings requires this court to make its own determination "as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing

---

[3] Mother attempts to raise a third issue—whether the trial court erred in finding that adoption by Stepmother was in the Children's best interests; however, that issue is not properly before this court.

evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d 507, 524 (Tenn. 2016) (citing *In re Bernard T.*, 319 S.W.3d 586, 596–97 (Tenn. 2010)). A trial court's ruling regarding whether the evidence sufficiently supports termination is a conclusion of law, which we review de novo with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009))

## ANALYSIS

### I.  GROUNDS FOR TERMINATION

The trial court found that Petitioners proved two grounds on which it could terminate Mother's parental rights, both of which fall under the statutory definition of abandonment set forth in Tennessee Code Annotated section 36-1-102(1)(A)(iv). The first ground was for willfully failing to support or visit the Children and the second ground was for conduct exhibiting a wanton disregard for the Children's welfare.

Tennessee Code Annotated section 36-1-102 contains five alternative definitions for abandonment, provided under subsections (i) through (iv). *In re Audrey S.*, 182 S.W.3d at 863 (citing Tenn. Code Ann. § 36-1-102(1)(A)(i)–(v)). By their plain language, the definitions in subsections (ii), (iii), and (v) are not applicable to this case.[4] The definition contained in subsection (i) applies when a parent has "willfully" failed to visit, support, or make reasonable payments toward the support of the child "[f]or a period of four consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent." Because a parent who is incarcerated has no means of paying support for her children, and thus, cannot be found to have "willfully" failed to support the child under this definition, the General Assembly provided two additional tests for abandonment for incarcerated or recently incarcerated parents in the definition contained in subsection (iv). *In re Audrey*, 182 S.W.3d at 865–66.

In *Audrey S.*, this court explained the distinction between these two tests and the reasoning behind them:

---

[4] Tennessee Code Annotated section 36-1-102(1)(A)(ii) applies when a child has been found to be a dependent and neglected child. Section 102(1)(A)(iii) applies only to biological or legal fathers. Section 102(1)(A)(v) applies when a mother voluntarily leaves her infant at a facility pursuant to Tennessee Code Annotated section 68-11-255.

The first test asks whether the parent "has willfully failed to visit[,] . . . support[,] or . . . make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's . . . incarceration." Tenn. Code Ann. § 36-1-102(1)(A)(iv). This test . . . shifts the focus from the four-month period immediately preceding the filing of the termination petition to the four-month period immediately preceding the parent's incarceration. . . . The second test asks whether the parent "has engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child." Tenn. Code Ann. § 36-1-102(1)(A)(iv). This test . . . is not expressly limited to any particular four-month period.

The General Assembly's decision to provide two additional tests for abandonment for incarcerated or recently incarcerated parents reflects, in part, the difficulties inherent in proving that a parent has willfully failed to visit or support a child for four consecutive months when the parent was incarcerated during all or part of that time. Incarceration necessarily restricts a prisoner's freedom of movement, and many prisoners have no resources with which to continue paying child support once their crimes and resulting imprisonment have forced them to forfeit their regular jobs. Thus, the parent's incarceration provides a ready-made excuse for his or her failure to visit or support the child during the four-month period made relevant by the first statutory definition of abandonment. However, the strong public interest in providing procedures for terminating the parental rights of unfit parents does not dissipate simply because a parent's irresponsible conduct has reached the level of criminal behavior and incarceration. Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s first test for abandonment prevents a parent from relying on his or her own criminal behavior and resulting imprisonment as a defense to the termination of his or her parental rights by allowing the court to examine the record of visitation and support during the most recent four-month period for which the excuse of incarceration is unavailable.

Tenn. Code Ann. § 36-1-102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. *Taxonomy of Children's Rights*, 11 Wm. & Mary Bill Rts. J. at 958. However, parental incarceration is not an infallible predictor of parental unfitness. Accordingly, Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s

second test for abandonment does not make incarceration alone a ground for the termination of parental rights. An incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

*Id.* at 865–66 (footnotes omitted).

Mother challenges the trial court's conclusion that Petitioners clearly and convincingly proved both tests for abandonment under Tenn. Code Ann. § 36-1-102(1)(A)(iv). We will discuss each in turn.

### A. Abandonment by Willful Failure to Support or Visit

The petition at issue was filed on August 2, 2017, at which time Tennessee Code Annotated section 36-1-102(1)(A) read in pertinent part:

For purposes of terminating the parental . . . rights of a parent . . . of a child to that child in order to make that child available for adoption, "abandonment" means that:

.    .    .

(iv). . . **[T]he parent . . . has been incarcerated** during all or part of the four (4) months immediately preceding the institution of such action or proceeding, **and** either **has willfully failed to visit or has willfully failed to support** or has willfully failed to make reasonable payments toward the support of **the child for four (4) consecutive months immediately preceding such parent's . . . incarceration**[.]

(Emphasis added).[5]

---

[5] In 2018, the Tennessee General Assembly amended this subsection to remove the element of willfulness from the definition of abandonment by failure to support or visit. *See* Tenn. Code Ann. § 36-

(continued…)

Pursuant to the law then in effect, a court may deem a parent to have abandoned his or her child when the parent was incarcerated for four months preceding a petition to terminate, **and** the parent has willfully failed to visit, support, or make reasonable payments toward the support of their child **for four consecutive months immediately preceding the parent's incarceration**. Mother was incarcerated on October 8, 2014, and remained incarcerated through the trial of this case. Thus, the critical four-month period "immediately preceding" Mother's incarceration spans from June 8, 2014, to October 7, 2014.

As with our review of any ground for termination, we first review the trial court's specific findings of fact, which we presume to be correct unless the evidence preponderates against them. *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004). We then determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the grounds for terminating the parent's parental rights. *Id.*

The trial court found that Mother "willfully abandoned" the Children by "being incarcerated for almost three and one-half years[.]" However, according to the plain language of the statute, a court may terminate a parent's rights on this ground only if there is evidence that the parent failed to support or visit "the child for (4) consecutive

---

1-102(1)(A)(i) (defining abandonment as, *inter alia*, "[f]or a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child"). Rather than include willfulness as an element of the ground, Tennessee Code Annotated section 36-1-102(1) now provides that it is an affirmative defense:

> For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

Tenn. Code Ann. § 36-1-102(1)(I), enacted by 2018 Tennessee Laws Pub. Ch. 875 (H.B. 1856), eff. July 1, 2018. We have previously held that this change will not apply retroactively. *See In re Gabriel B.*, No. W2017-02514-COA-R3-PT, 2018 WL 3532078, at *4 n.7 (Tenn. Ct. App. July 23, 2018) ("Because this change is substantive rather than procedural or remedial, however, the amended statute will not be applied retroactively to this case." (citing *In re D.A.H.*, 142 S.W.3d 267, 273 (Tenn. 2004))). Thus, we apply the version of the statute at issue when the case was initiated.

months **immediately preceding** such parent's . . . incarceration." Tenn. Code Ann. § 36-1-102(1)(A)(iv) (emphasis added) The court made no findings of fact on Mother's support or visitation during the four-month period immediately preceding her incarceration, and the record contains no evidence regarding Mother's support or visitation during this statutorily prescribed period of time. Consequently, Petitioners failed to prove that Mother abandoned the Children by willfully failing to support or visit under Tennessee Code Annotated section 36-1-102(1)(A)(iv).

### B. Abandonment by Exhibiting Wanton Disregard for the Children

Under the second test for abandonment for incarcerated or recently incarcerated parents, a court may deem a parent to have abandoned his or her child when the parent "engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child." *Id*. § 36-1-102(1)(A)(iv). This definition requires courts "to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *In re Audrey S.*, 182 S.W.3d at 866. We have explained that "a parent's criminal behavior does not automatically constitute wanton disregard for the welfare of a child," but such behavior "may constitute such wanton disregard under the appropriate circumstances." *In re Kierra B.*, No. E2012-02539-COA-R3-PT, 2014 WL 118504, at *8 (Tenn. Ct. App. Jan. 14, 2014). When considering whether a parent's criminal conduct constitutes wanton disregard, we consider "the severity and frequency of the criminal acts." *Id*.

The trial court held that Mother's conduct "prior to and during her incarceration" constituted conduct exhibiting a wanton disregard for the Children's welfare. As an initial matter, we note that Mother's conduct "during her incarceration" cannot be the basis for termination on this ground. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv) (providing a parent may be found to have abandoned the child by engaging in conduct **before** incarceration that exhibits a wanton disregard for the child's welfare). As noted earlier, Mother was incarcerated on October 8, 2014, and remained incarcerated through the trial of this case. Therefore, the court's analysis of this ground is restricted to Mother's conduct **prior to** October 8, 2014.

The trial court found, *inter alia*, that Mother involved Johnathan in a shoplifting incident in 2011, stole a ring from her employer and pawned it in 2012, served as a lookout while her family committed a crime in 2013, violated her probation on numerous occasions, and was arrested at least three times for driving on a suspended license. The court further found that Mother's conduct directly affected the Children because Johnathan was removed from school for stealing. After reviewing the record, we find that the evidence preponderates against some of these findings.

First, we find no evidence that Mother involved Johnathan in the shoplifting incident.[6] The court found that "certain items were placed in the child's diaper during the shoplifting incident" based on Father's testimony; however, it appears the court conflated Father's testimony on two separate issues. During direct examination, Father testified that he believed Mother's "actions" affected the Children because the Children tried to put items in their pockets when Father took them shopping. In an apparent non sequitur, Father proceeded to say that he tried to "potty train" the Children, but Mother would "just throw them in a diaper." Presumably, the court mistook Father's statement about throwing "them" in a diaper as a reference to Mother's method of shoplifting. The record contains no other evidence that Mother involved the Children in her alleged shoplifting or any other criminal conduct.

Further, the evidence does not support a finding that Mother's conduct directly affected the Children by causing their removal from school. Stepmother stated that Johnathan's thefts at school could be attributed to Mother's conduct because "neither me nor my husband steals and none of our other children steal." Likewise, Father implied that Johnathan's "sticky fingers problem" resulted from Mother's influence. However, the mere fact that Mother was arrested once for shoplifting does not support a finding that Mother's conduct caused Johnathan's bad behavior at school. Accordingly, the evidence preponderates against these two findings.

However, the record supports the trial court's findings regarding Mother's history of criminal behavior, her repeated incarcerations and multiple probation violations, which "can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re Audrey S.*, 182 S.W.3d at 868; *see also In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006) ("Wanton disregard for the welfare of the child can be established by the parent's previous criminal conduct along with a history of drug abuse.").

As we analyze whether a parent's pre-incarceration conduct exhibited a wanton disregard for his or her child's welfare, "we consider the facts and circumstances surrounding our other decisions where we have sustained a finding of wanton disregard." *In re Renaldo M.*, No. M2016-00472-COA-R3-PT, 2017 WL 1041541, at *4 (Tenn. Ct. App. Feb. 7, 2017). "By defining the term by examples, Tennessee courts have

---

[6] The court notes that the shoplifting charge was dropped and Mother never admitted to the crime during trial. *But see In re Cidney L.*, No. W2014-00779-COA-R3-PT, 2014 WL 6453549, at *5 (Tenn. Ct. App. Nov. 18, 2014) (recognizing that evidence of dismissed charges did not prove that the parent committed the crime charged, but the dismissed charges did provide "evidence of [m]other's instability prior to incarceration").

recognized 'wanton disregard' in much the same way as Justice Potter Stewart identified pornography: '[we] know it when [we] see it.'" *In re Anthony R.*, No. M2014-01753-COA-R3-PT, 2015 WL 3611244, at *2 (Tenn. Ct. App. June 9, 2015) (quoting *Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964) (J. Stewart, concurring)).

In cases where we have found a petitioner proved wanton disregard, and where the parent's conduct was not particularly egregious and did not directly threaten the child's safety, more than one type of bad conduct has usually been present. *See, e.g., In re D.M.*, No. M2009-00340-COA-R3-PT, 2009 WL 2461199, *4–5 (Tenn. Ct. App. Aug. 12, 2009) (holding that the father's criminal behavior *and* failure to provide for or support the child constituted wanton disregard).[7] For example, in *In re K.F.R.T.*, 493 S.W.3d 55, 61 (Tenn. Ct. App. 2016), we held that wanton disregard was proven when there was proof that the father "was arrested for theft, multiple D.U.I. offenses, repeated traffic offenses, domestic violence . . . , multiple illegal border crossings, and even extortion," which "resulted in multiple incarcerations and/or deportations." We explained our reasoning as follows: "When viewed in their totality, these offenses clearly indicate that the 'parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders [father] unfit or poses a risk of substantial harm to the welfare of the child[ren].'" *Id*. (quoting *In re Audrey S.*, 182 S.W.3d at 866).

On the other hand, when a finding of wanton disregard is based solely on one criminal incident that did not directly threaten the child's safety, we have found the evidence did not clearly and convincingly establish conduct exhibiting wanton disregard for a child's welfare. In *In re Renaldo M.*, 2017 WL 1041541, at *3, the trial court terminated the mother's parental rights after making the following findings:

> Subsequent to the children's placement in foster care, [Mother] . . . engaged in criminal behavior that led to [her] incarceration in January 2015 for charges related to burglary. [Mother was] ultimately convicted of theft for these charges. Additionally, thereafter [Mother was] arrested, incarcerated, and convicted of contributing to the delinquency of a minor. . . . [Mother] knew that [her] children were in foster care and the tasks and requirements that needed to be completed in order to reunify with the children. [She] was

---

[7] In cases where we found that only one type of conduct exhibited wanton disregard, the conduct either directly threatened the child's safety, was particularly egregious, or comprised an extensive criminal history. *See In re C.T.S.*, 156 S.W.3d 18, 25 (Tenn. Ct. App. 2004) (holding that the mother exhibited wanton disregard by ingesting crack cocaine while pregnant with the child); *see also In re G.M.H.*, No. M2006-02665-COA-R3-PT, 2007 WL 1527003, *3 (Tenn. Ct. App. May 24, 2007) (holding that the father exhibited wanton disregard by sexually abusing the children's stepsister).

- 11 -

also aware that [her] failure to do so could lead to termination of [her] parental rights. Despite this knowledge and the efforts of DCS to assist [her] in reunifying with the children, [Mother] . . . continued to fail to comply with the Department and the orders of the Juvenile Court as well as continued to engage in criminal activity which led to the delinquency of a minor. The Court finds that this conduct shows a disregard for the welfare of the children.

Additionally, the Court finds that the conduct of [Mother] in allowing unrelated adults in and out of the family home, which potentially led to the theft of [her] children's medication on two occasions, domestic violence incidents in the home, and drinking and partying in the home, shows the [Mother's] disregard for the welfare of [her] children. The Court finds that the [Mother] chose to engage in this conduct rather than concentrating on [her] parenting and reunifying with [her] children. In addition, the [Mother's] continual violation of this Court's orders regarding unrelated adults and animals in the home exhibits a complete disregard of the children's welfare . . . .

In the *Renaldo M.* appeal, we noted that, while the mother's behavior led to her being arrested on two separate occasions for two separate crimes, "the conduct giving rise to each conviction occurred on [the same date]." *Id.* Thus, the two convictions did not represent multiple acts of conduct. Consequently, we concluded, "The charges arising from this incident alone do not support the trial court's finding that Mother '*continued* to engage in criminal activity which led to the delinquency of a minor.'" *Id.*

In reaching our conclusion in *Renaldo M.*, we compared and contrasted the mother's pre-incarceration conduct with that of parents in other cases. *Id.* at *4 (citing *In re Kierra B.*, 2014 WL 118504, at *8 (finding that the father showed a wanton disregard for his child by engaging in "criminal behavior [that] was serious and detrimental to [the] child's welfare" and which resulted in him being "absent from [the child's] life for most of her childhood"); *In re K.F.R.T.*, 493 S.W.3d at 61 (finding that the father's behavior was part of a broader pattern of conduct that rendered him unfit because he "was arrested for theft, multiple D.U.I. offenses, repeated traffic offenses, domestic violence against the biological mother of the children central to this appeal, multiple illegal border crossings, and even extortion"); *In re Donte N.*, E2013-01617-COA-R3-PT, 2014 WL 201612, at *8 (Tenn. Ct. App. Jan. 17, 2014) (finding that father exhibited a wanton disregard for his children after he failed to comply with the permanency plan and moved out of state, where he was then convicted of several offenses and received two one-year sentences for charges involving minors); *In re C.L.D.*, No. M2008-02805-COA-R3-PT, 2009 WL 1684667, at *7 (Tenn. Ct. App. June 15, 2009) (concluding that the mother exhibited a wanton disregard for her children by, among other things, "being arrested approximately

forty-seven times," leaving two of the children "with her grandmother who, admittedly, was unable to care for them" and leaving the youngest child "in the care of complete strangers"); *In re Selena L.*, No. E2015-02059-COA-R3-PT, 2016 WL 4056185, at *12 (Tenn. Ct. App. July 27, 2016) (finding that the mother's "conduct prior to her incarceration, including both her criminal activity and her illegal drug use, clearly and convincingly constituted a wanton disregard for the welfare of the Children"); *In re Charles K. Jr.*, No. M2015-00714-COA-R3-PT, 2016 WL 3036049, at *10 (Tenn. Ct. App. May 19, 2016) (finding clear and convincing evidence that the father showed wanton disregard for the children where the father "exhibited a substantial amount of criminal behavior, . . . engaged in domestic violence toward Mother while in the presence of the Children, and . . . failed to address his mental health and substance abuse issues")).

In addition to comparing the severity and frequency of the conduct at issue in *Renaldo M.*, our decision was influenced by "the higher standard of proof that is required before a party may be deprived of the constitutional right to be a parent to his or her child." 2017 WL 1041541, at *5. We noted that "[t]he record shows that . . . Mother has shown a great deal of care and concern for the children, and she has made a genuine effort to establish a meaningful relationship with them." *Id*. Before the mother's incarceration, she completed parenting classes, attended visitations, and completed tasks on her permanency plan. *Id*. After considering the entire record and our decisions in the cases mentioned above, we held that the evidence did not prove clearly and convincingly that the mother's pre-incarceration conduct exhibited a wanton disregard for the children's welfare. *Id*.; *see also In re E.C.*, No. E2016-02582-COA-R3-PT, 2017 WL 2438574, *13 (Tenn. Ct. App. June 6, 2017) (finding that a single instance of bad conduct did not lead to a finding of abandonment when there were "redeeming factors" present).

In the case at bar, Mother's pre-incarceration conduct was less severe and frequent than the conduct of the parents in the cases referenced in *Renaldo M.*, but her conduct was more frequent and severe than the mother's conduct in *Renaldo M.* As we noted earlier, when considering whether a parent's criminal conduct constitutes wanton disregard, we consider the conduct's "severity" and "frequency" of the conduct. *In re Kierra B.*, 2014 WL 118504, at *8. We consider whether the parent's behavior that resulted in incarceration is part of a broader pattern of conduct that renders her unfit or poses a risk of substantial harm to the welfare of the children. *In re Audrey S.*, 182 S.W.3d at 866. Further, we recognize that a parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. *Id*. (citing James G. Dwyer, *A Taxonomy of Children's Existing Rights in State Decision Making About Their Relationships*, 11 Wm. & Mary Bill Rts. J. 845, 958 (2003)). Accordingly, it is significant when a parents have been given opportunities to rehabilitate themselves and fail to take advantage of those opportunities. *See State Dep't of Children's Servs. v. J.M.F.*, No. E2003-03081-COA-R3-PT, 2005 WL 94465, at *7 (Tenn. Ct. App. Jan. 11, 2005) ("[A]n incarcerated parent who has multiple drug

- 13 -

offenses and wastes the opportunity to rehabilitate themselves by continuing to abuse drugs, resulting in revocation of their parole and re-incarceration, constitutes abandonment of the child, and demonstrates wanton disregard for the welfare of the child.").

Viewing Mother's history, we see a broad pattern of criminal conduct over more than two years. Specifically, Mother's conduct resulted in her being arrested and incarcerated six times between June 2012—when the Children were one and three years old, respectively—and October 2014—when she was last incarcerated, at which time the Children were three and five years old, respectively. Moreover, Mother's multiple violations of the terms of her probation are also relevant, because Mother testified that she "knew the consequences" of violating her probation. Furthermore, although driving on a suspended license is not a severe offense and is not the type of conduct that renders a parent unfit or poses a risk of substantial harm to the welfare of the child, Mother's offenses for driving on a suspended license while on probation for more severe offenses are relevant when considered "in combination" with other conduct and circumstances. *See In re Audrey S.*, 182 S.W.3d at 867–68 ("[P]robation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child."). The frequency of Mother's criminal conduct and probation violations, when considered along with the severity of Mother's three convictions for theft and one conviction for child neglect, clearly and convincingly proved a pattern of conduct that exhibited a wanton disregard for the welfare of her children. Therefore, we affirm the trial court's determination that Petitioners proved the ground of abandonment by engaging in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child under Tennessee Code Annotated section 36-1-102(1)(A)(iv).

Because one of the statutory grounds for termination has been proven, we must determine whether terminating Mother's parental rights is in the Children's best interests.

## II. BEST-INTEREST ANALYSIS

In addition to presenting clear and convincing evidence establishing at least one statutory ground warranting the termination of parental rights, a petitioner must present clear and convincing evidence that terminating the parent's rights is in the best interests of the children. *In re Bernard T.*, 319 S.W.3d at 606 (citing Tenn. Code Ann. § 36-1-113(c)(2); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007)). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Carrington H.*, 483 S.W.3d at 523 (quoting *In re Angela E.*, 303 S.W.3d 240, 254 (Tenn. 2010)). While the combined weight of the evidence must meet the clear and convincing standard, facts considered in

- 14 -

the best-interest analysis need be proven only "by 'a preponderance of the evidence, not by clear and convincing evidence.'" *In re Gabriella D.*, 531 S.W.3d 662, 681 (Tenn. 2017) (quoting *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015)). The best-interest analysis is guided by a consideration of the factors in Tennessee Code Annotated section 36-1-113(i). *In re Bernard T.*, 319 S.W.3d at 606.

When considering the statutory factors, "courts must remember that the child's best interests are viewed from the child's, rather than the parent's, perspective." *In re Gabriella D.*, 531 S.W.3d at 681 (quoting *In re Audrey S.*, 182 S.W.3d at 878). "[A] focus on the perspective of the child is the common theme evident in all of the statutory factors." *Id*. Accordingly, "[w]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child." Tenn. Code Ann. § 36-1-101(d).

Tennessee Code Annotated section 36-1-113(i) requires courts to consider all statutory factors that are relevant; nevertheless, the best-interest analysis "does not call for a rote examination" of the factors, *In re Audrey*, 182 S.W.3d at 878. Instead, it requires "more than tallying the number of statutory factors weighing in favor of or against termination," *In re Gabriella D.*, 531 S.W.3d at 682 (citing *White v. Moody*, 171 S.W.3d 187, 193–94 (Tenn. Ct. App. 2004)). "[T]he facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case," and the analysis "must remain a factually intensive undertaking." *In re Gabriella D.*, 531 S.W.3d at 682. Thus, "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

Although Tennessee Code Annotated section 36-1-113(i) lists nine factors relevant to the best-interest analysis, the list is illustrative, not exclusive. *In re Carrington H.*, 483 S.W.3d at 535. The parties may offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interests." *In re Kaliyah S.*, 455 S.W.3d at 555.

On appeal, this court first reviews a trial court's factual findings de novo and accords these findings a presumption of correctness unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *In re Carrington H.*, 483 S.W.3d at 524 (citations omitted). However, the trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which we review de novo with no presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d at 393)). In light of the heightened burden of proof in termination

proceedings, we must then make our "own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596–97).

The trial court found that terminating Mother's parental rights was in the Children's best interests because Mother (1) had not maintained regular contact with the Children, (2) had no meaningful relationship with the Children, (3) made no adjustment of circumstances, and (4) because a change in caretakers and physical environment would have a negative effect on the Children. We, however, have determined that the third and fourth factors relied upon by the trial court do not apply to this case because the Children were not "removed" from Mother's care, which generally occurs when the children are in the custody of the state and placed in foster care. *In re William T.H.*, No. M2013-00448-COA-R3-PT, 2014 WL 644730, at *4–5 (Tenn. Ct. App. Feb. 18, 2014); *In re C.E.P.*, No. E2003-02410-COA-R3-PT, 2004 WL 2191040, at *5–6 (Tenn. Ct. App. Sept. 29, 2004). Additionally, because one of the petitioners is the father of the Children, denying the petition to terminate would not effect a change of caretakers and physical environment as when the children are in foster care. *Id.* As we explained in *William T.H.*:

> A number of the statutory factors, by their language, were intended to apply in situations where a child has been removed from the home, is in the custody of the state, and is in foster care. In those situations, the preference is for the child to remain in foster care the least amount of time possible. If the parent does not make adjustments that would allow the return home of the child, termination of parental rights is the only way the child can obtain the stability of adoption. Consequently, many of the statutory factors focus on conditions in the home of the parent. Examples include:
>
> > (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;
> >
> > .        .        .
> >
> > (5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

*Id.* at *4–5 (quoting Tenn. Code Ann. § 36-1-113(i)).

In this case, the Children were not "removed" from Mother's care due to circumstances, conduct, or conditions that made it unsafe to be in Mother's home. Additionally, Father has full custody of the Children and Mother was not seeking custody

- 16 -

of the Children; thus, a denial of the petition would not result in a change of caretakers or physical environment. Accordingly, we will analyze the remaining factors relied on by the trial court along with other relevant factors, and consider the proof put forth by the parties, to determine whether the combined weight of the evidence clearly and convincingly proves that termination is in the Children's best interests.

### A. Maintaining Regular Contact and Meaningful Relationship

Tennessee Code Annotated section 36-1-113(i), the third factor relied upon by the trial court, is "[w]ether the parent or guardian has maintained regular visitation or other contact with the child." Tenn. Code Ann. § 36-1-113(i)(3). The fourth factor the trial court relied upon is "[w]ether a meaningful relationship has otherwise been established between the parent or guardian and the child." *Id*. § 36-1-113(i)(4).

The trial court held that these factors supported terminating Mother's parental rights because Mother had "not maintained regular contact with the minor children, although she could have called once per week," and that Mother did "not have a meaningful relationship with the minor children, as Johnathan was five (5) years old and Jordan was three (3) years old at the time of her . . . incarceration."

Mother argues that her lack of contact and meaningful relationship with the Children should not be used against her because Petitioners interfered with her ability to contact the Children. Mother cites *Audrey S.* for the proposition that a parent's failure to visit is excusable when another person's conduct "amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child." *In re Audrey S.*, 182 S.W.3d at 864–65 (holding that the mother's failure to visit her children was not "willful" because the father refused to allow the children to visit her) (internal citations omitted). However, in *Audrey S.*, this court was considering whether the mother's conduct constituted a "willful" failure to visit under the first statutory definition of abandonment, Tennessee Code Annotated section 36-1-102(1)(A)(i). *Id*. As we have explained, the best-interest analysis is conducted from the child's perspective. *In re Audrey S.*, 182 S.W.3d at 878. "From the child's point of view, the reasons for the lack of interaction matter little." *White*, 171 S.W.3d at 194.

Nonetheless, there is a precedent for finding that a petitioner's interference with the parent's attempts to contact his or her child may render the factors inapplicable. In the case of *In re Taylor B.W.*, the Tennessee Supreme Court affirmed a trial court's finding that termination was not in the best interests of the children, even though the incarcerated mother no longer had a relationship with her children and had not maintained contact for several years. 397 S.W.3d 105 at 107–109, 114 (Tenn. 2013). The mother was incarcerated after pleading guilty to the attempted second-degree murder of the father and received a sentence of 12 years. *Id*. at 107. At the time, the children were seven and five years old. *Id*. The mother and father entered into an amended custody agreement that

provided the mother with visitation with the children on one weekend per month. *Id*. The custody agreement also contemplated visitation after the mother was released from prison. *Id*. Even so, the children stopped visiting the mother five years later when the father remarried. *Id*. The father and stepmother then filed a petition to terminate the mother's rights and for stepparent adoption. *Id*.

By the time of the trial, the mother had not seen the children for two years. *In re Taylor B.W.*, No. E2011-00352-COA-R3-PT, 2011 WL 5135256 (Tenn. Ct. App. Oct. 28, 2011). The youngest daughter testified that she had few memories of the mother and both children voiced a desire to terminate the mother's rights and be adopted by the stepmother. *In re Taylor B.W.*, 397 S.W.3d at 109. Nonetheless, the trial court determined that the father and stepmother failed to prove by clear and convincing evidence it was in the best interests of the children to terminate the mother's parental rights. *Id*. at 110. The trial court found that the mother attempted to have regular visitation or contact with the children to the extent that it was within her power to do so, and that she had a meaningful relationship with her children before the stepmother became involved with the father. *Id*. at 109 (citing Tenn. Code Ann. § 36-1-113(i)(3), (4)). As a result, the trial court found that these factors weighed against terminating the mother's parental rights. *Id*. at 110.

On appeal, the Supreme Court found that the evidence did not preponderate against the trial court's findings that the mother had a meaningful relationship with the children *before* she was incarcerated, and that the mother's attempts to reestablish a relationship with the children were frustrated by the father. *Id*. at 113. Thus, the Court agreed that these factors did not support terminating the mother's parental rights. *See id*. at 114 (stating that none of the factors supported termination of the mother's parental rights). The Court also held that the trial court properly considered that the father had agreed to the modification of the parenting plan to provide the mother with visits from the children and address her co-parenting rights after her release. *Id*.

Like the mother in *Taylor B.W.*, Mother had a meaningful relationship with the Children before she was incarcerated and attempted to maintain contact with them. Mother testified that she took the Children to church, read stories to them every night, played outside with them, and took them to the park. Additionally, the court admitted photographs of Mother and the Children that showed they shared an affectionate relationship.

Sheena W., a friend of Mother, testified that Mother took the Children to the park and spent time with them at home. Amber S., who had lived with Mother for almost two years, testified that Mother would cook meals with the Children, give them baths, and read books to them before they went to bed. Kimberly F., Mother's paternal aunt, testified that Mother was "always very good with her children," playing with them and

involving them in cooking meals. Both Kimberly and Amber testified that Mother was at home with the Children most of the time on the days when they were in her care.

Although Father testified that he did not believe Mother had a meaningful relationship with the Children before her incarceration, he offered little explanation to support his opinion. Both Father and Stepmother testified that Mother disappointed the Children once when she promised to take them to a movie and did not. Father also testified that sometimes the Children did not want to go with Mother when she picked them up. However, Father also testified that the Children asked about their mom during the first two or three months after she went to prison and would sometimes seem upset or bothered by Mother's absence. Father also testified that the Children were disappointed when Mother missed her regular Monday evening telephone call. These facts suggest that Mother had a relationship with the Children before she was incarcerated.

Mother also attempted to maintain a relationship with the Children by communicating with them by telephone and mail. Like the father in *Taylor B.W.*, Father had agreed to a modified custody arrangement that contemplated visitation during and after Mother's incarceration. Nonetheless, Father and Stepmother actively and repeatedly interfered with Mother's attempts to communicate with the Children. Mother testified that she maintained contact with the Children during the first ten months of her incarceration by calling Father's cellular telephone. In July 2015, Mother began contacting the Children by calling Petitioners' home telephone number, and Stepmother began logging the calls in a notebook. According to Stepmother's notes, Mother was allowed one 15-minute telephone call per week, on Monday evenings between 7 p.m. and 8 p.m.[8] Mother called and spoke with the Children on three Mondays in July 2015 and on one Monday in August 2015.

In September 2015, Mother was moved from the Sumner County Jail to Nashville Women's Penitentiary. Mother testified that she was not permitted to make calls for a month after she arrived. She also testified that she did not have money to make calls and could not get a job at the prison because she was being held there temporarily. In December 2015, Mother was moved to a facility in Memphis. After arriving, Mother wrote a letter to Father explaining that she would not have funds to call the Children until

---

[8] Stepmother's notes indicate that these limitations were per court order; however, the juvenile court's order of November 16, 2015, restricts Mother's contact to "one phone call per week." Nonetheless, the record shows that the majority of Mother's calls occurred on Monday evenings.

she received her first paycheck in January 2016.[9] Mother testified that she earned only 17 cents per hour. However, Father did not reply to the letter. At the final hearing, Father admitted that he did not even read Mother's letters.

Furthermore, Father and Stepmother's admissions establish that they actively obstructed Mother's attempts to speak with the Children. Stepmother's record of the telephone calls shows that Stepmother either denied Mother's calls or refused to allow her to speak to the Children on three occasions when Mother called at a wrong time or on a wrong day, while Mother protested that it was the only time she could call. In addition, Stepmother admitted that she once interrupted Mother's conversation with the Children because Mother was talking about playing volleyball and having a pet turtle. Stepmother testified, "I don't appreciate her telling my children, you know, that prison is a good place to be." Stepmother also admitted that she told Mother to stop calling the Children.

Father testified that he would not pay for Mother's telephone calls and he admitted that he and Stepmother denied one of Mother's phone calls after she and Stepmother disagreed on the telephone because, in his words, "she ain't going to call and disrespect us in our own house . . . . She's supposed to be nice to us . . . . [W]e're the ones letting her talk to the kids." Father explained that he and Stepmother "got on to her" because they did not want the kids to think jail was a good place to be. Father testified that they always stayed at home on Monday evenings to wait for Mother's phone calls, "unless [they] had something else to do." Father also testified that he was tired of waiting for telephone calls that never came and telling the Children to talk to Mother when they did not want to. He eventually told them to tell Mother they did not want to talk to her, which they did. Father testified that Mother "really didn't do much calling back" after that.

Mother's telephone records from the Tennessee Department of Corrections ("TDOC") also show that Mother attempted to call on several Mondays at the designated time, and the calls went unanswered.[10] Although Mother called on fewer Mondays than she could have, the TDOC records show that Petitioners refused or did not answer Mother's calls more often than answering them.

---

[9] Sheena W. corroborated Mother's testimony that the lack of funds was a major reason why Mother did not call the Children. Sheena, who adopted Mother's younger two children, testified that she paid for Mother to call and speak with the younger children on a regular basis. The Tennessee Department of Corrections records confirm that Mother made frequent calls to Sheena's telephone number throughout Mother's time in prison.

[10] Although Stepmother's call-log states that Mother did not call on one of these days, the phone records show that she made four attempts to call the Petitioners' number that evening.

Mother also testified that she called around Mother's Day, and Stepmother told her, "[I]f you've called to get props for Mother's Day or sympathy or something . . . I'm the one that they're taking out for Mother's Day."[11] After Stepmother told Mother to stop calling in June 2016, Mother attempted to call three weeks in a row, but none of the calls were answered. According to Stepmother's notes, Petitioners were not home on those occasions. Mother testified that she tried contacting one of her former attorneys about not being able to contact the Children and that she thought a letter had been sent to Father's attorney about the Petitioners not answering their phone.

The record also establishes that Father and Stepmother prevented Mother from contacting the Children via mail. In Mother's July 2015 letters to the Children, she included a picture of her and her two youngest children. She informed Father that her grandmother was dying and indicated that she wanted the Children to say goodbye. Mother received no reply to that letter. According to Mother's testimony, Stepmother later said that she threw the picture away because she did not want the Children to think that Mother was with Mother's two younger children but not them. Mother also testified that she wanted to send gifts to the Children, but Stepmother said she would not give the gifts to the Children because it would not be fair for the Children to receive gifts if Stepmother's children did not receive gifts.

Father and Stepmother's testimony corroborates Mother's testimony that the gifts and letters were not delivered to the Children. Father testified that he and Stepmother let the Children see the letters and gifts but did not let the Children keep them because "that's evidence if we need [it]." In addition, Father said that Mother sent "some stuff she made in jail," but he concluded, "Who wants to give their kids something they made in jail?" Stepmother testified that she did not give or read Mother's letters to the Children because the letters were "all broken promises she's made or continues to make," and contained "inappropriate" statements. When pressed for an example, Stepmother admitted that none of the correspondence introduced into evidence contained inappropriate statements.

Admittedly, Mother's meaningful, pre-incarceration relationship with the Children deteriorated while she was incarcerated. Father testified that, over time, the Children no longer seemed interested in speaking with Mother when she called. Father testified that the younger child, Jordan, did not remember Mother and neither child had said anything about her in over a year. Although some fault lies with Mother, fault also lies with

___

[11] Stepmother admitted that she and Mother had a rivalry over Father because he had dated both of them when they were younger.

Petitioners' active and repeated interference with Mother's attempts, albeit not herculean, to communicate with the Children to maintain a relationship.

Considering Mother's pre-incarceration relationship with the Children, the circumstances of her incarceration, Father's agreement to the juvenile court's custody modification, Mother's attempts to contact the Children, and Petitioners' active and repeated interference with Mother's attempts, we hold that factors three and four do not favor termination of Mother's parental rights.

## B. Combined Weight of the Evidence

After making the underlying factual findings, the court must consider whether the combined weight of the facts amount to clear and convincing evidence that termination is in the child's best interests. *See In re Gabriella D.*, 531 S.W.3d at 681; *see also In re Kaliyah S.*, 465 S.W.3d at 555. As discussed earlier, a trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which we review de novo with no presumption of correctness. *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d at 393)). Moreover, in light of the heightened burden of proof in termination proceedings, on appeal we must make our "own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *In re Carrington H.*, 483 S.W.3d at 524 (citing *In re Bernard T.*, 319 S.W.3d at 596–97).

"'Clear and convincing evidence' is 'evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Valentine*, 79 S.W.3d at 546 (Tenn. 2002) (quoting *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). After considering the combined weight of the evidence, we have serious and substantial doubt that termination of Mother's parental rights is in the best interests of the Children. Therefore, we hold that the Petitioners failed to prove by clear and convincing evidence that termination was in the Children's best interests.

### IN CONCLUSION

For the foregoing reasons, we affirm the trial court's finding that Mother exhibited a wanton disregard for the Children's welfare, reverse the finding that terminating Mother's parental rights is in the Children's best interests, and vacate the judgment terminating Mother's parental rights. Costs of appeal are assessed against the appellees, Joshua M. and Brittany M.

_____
FRANK G. CLEMENT JR., P.J., M.S.